Filed 1/27/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| JULIE VANDERMOST, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEBRA BOWEN, | ) | |
| as Secretary of State, etc., | ) | S198387 |
| | ) | |
| Respondent; | ) | |
| | ) | |
| CITIZENS REDISTRICTING | ) | |
| COMMISSION, | ) | |
| | ) | |
| Intervener. | ) | |
| _____ | ) | |

On December 9, 2011, we issued an order to show cause in this matter to consider an election-related question that must be addressed expeditiously to avoid potential disruption of the statewide primary and general elections to be held in June and November 2012. A proposed referendum (designated No. 1499), for which petition signatures have been gathered and submitted to election officials, would require the electorate to decide, at the November 2012 general election, whether to accept or reject the California state Senate district map that has been certified by the Citizens Redistricting Commission (Commission).[1] The Commission, a new constitutional entity

---

[1] Under the California Constitution, the referendum power refers to the authority of the people to require that a statute that has been adopted by the Legislature, or a redistricting map that has been certified by the Citizens Redistricting Commission, be

*(Footnote continued on following page)*

1

recently established by the voters to draw voting district boundaries (instead of the Legislature)[2] in light of population changes identified in the national census undertaken at the beginning of each decade, completed its eight-month-long task in August 2011 and certified new voting district maps for not only the state Senate, but also for the state Assembly, the United States Congress, and the State Board of Equalization. The Secretary of State and county election officials have been using these four Commission-certified maps since mid-August 2011 in preparation for the upcoming June and November 2012 elections.

County election officials and the Secretary of State currently also are in the process of verifying the petitions submitted to determine whether there are sufficient valid signatures to qualify the proposed referendum for placement on the November 2012 general election ballot. If the referendum qualifies, the state Senate map certified by the Commission will automatically be stayed, presenting the question of what Senate districts should be used for the 2012 primary and general elections of the state Senate. In view of the numerous interconnected election-related events that must occur soon after the end of January 2012 in order to avoid disrupting the 2012 primary and general elections,[3] this

---

(*Footnote continued from previous page*)

submitted to a vote of the electorate, and be approved by the electorate before such measure becomes effective. (Cal. Const., art. II, § 9; *id.*, art. XXI, § 2, subd. (i).) The initiative power, by contrast, refers to the authority of the people to propose statutes and constitutional amendments to be submitted to a vote of the electorate, and the authority of the electorate to adopt or reject the proposed measure. (Cal. Const., art. II, § 8.)

[2]     See California Constitution, article XXI, sections 1 to 3.

[3]     The calendar of steps in preparation for the June 5, 2012, Primary Election is available on the Secretary of State's Web site, <http://www.sos.ca.gov/elections/2012-elections/calendar/pdfs/section-6-primary-election.pdf> (as of Jan. 27, 2012). Among the events particularly relevant to the present case are the following: From December 30, 2011, to February 23, 2012, state Senate candidates may obtain, in lieu of paying filing fees, the requisite number of signatures of registered voters who are eligible to vote for

(*Footnote continued on following page*)

action has been filed requesting this court to decide at this juncture which state Senate district map should be utilized if the proposed referendum qualifies and triggers a stay of the Commission's certified Senate district map.

Petitioner, Julie Vandermost, emphasizes the interest of referendum proponents and petition signers in insisting on an "up or down" referendum vote by the statewide electorate *before* the voting districts that are the subject of the proposed referendum are utilized as the basis for electing any state senators.  Accordingly, she asserts, if the Commission's state Senate map is stayed by the qualification of the referendum for the November 2012 ballot, we should not order the use of the Commission's state Senate district map as an interim remedy governing the 2012 primary and general elections. Indeed, petitioner argues, we should issue an "alternative [or] peremptory writ of mandate commanding Respondent Debra Bowen, in her capacity as Secretary of State of the State of California, to . . . refrain from taking any action . . . implementing the Citizens Redistricting Commission's certified Senate map."  Moreover, petitioner urges, we should establish new interim state Senate boundaries by either (1) using the state

_____

(*Footnote continued from previous page*)

that candidate — in other words, those who are registered in the district in which the candidate will run (Elec. Code, § 8106); and between February 13, 2012, and March 9, 2012, candidates must file a "Declaration of Candidacy" and nomination papers (*id*., §§ 8020, 8040, 8041) for the district in which he or she will run.

The Secretary of State has submitted a declaration by Jana M. Lean, Chief of the Elections Division, describing procedures used to implement the new district lines. According to the declaration, a system known as CalVoter II (CVII) "is used to set up an election.  Throughout the election cycle, which begins more than five months before the election is held, CVII is used to certify statewide candidates [and] prepare the certified list of candidates."  The declaration describes the various steps that must be taken to program CVII, and asserts — apparently assuming those same internal timelines, and no effort to further expedite them — that "approximately six weeks would be required to implement any changes to the Senate maps."

3

Senate district map that the Legislature created in 2001 based on the 2000 census and that has been used for the last decade; (2) using a map creating new Senate districts by using the state Assembly districts recently certified by the Commission and combining two adjacent Assembly districts to form each new Senate district (the "nesting" proposal); or (3) establishing alternate, court-drawn boundaries as described in a new so-called "model" map based on a proposal submitted by petitioner's redistricting consultant. Finally, petitioner prays for an order directing the Secretary of State to implement whatever new interim district boundaries we select for the June 5, 2012, Primary Election and the November 6, 2012, General Election.[4]

The Secretary of State and the Commission both urge us to hold that even if the Commission's certified state Senate district map eventually is stayed by the qualification of the proposed referendum, the Commission's map nevertheless should be employed for the 2012 elections. The Secretary of State stresses the need to avoid disruption of the election planning process; both the Secretary and the Commission contest the legality of petitioner's alternative maps; and the Commission emphasizes that the state Senate redistricting map it has certified is the product of an open, deliberate, and nonpartisan process that a majority of California voters created through the exercise of the constitutional initiative power in 2008 and 2010.

As past decisions establish, if a referendum that is directed at a newly adopted redistricting map qualifies for the ballot, triggering a stay of the new redistricting map pending the electorate's vote on the referendum, this court has the responsibility of determining which voting district map should be used for the upcoming interim electoral cycle. (See, e.g., *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 657-658; accord,

---

[4]     All parties agree that any interim state Senate district map that we decide should be used for the June 2012 primary election must also be used for the November 2012 general election.

*Legislature v. Reinecke* (1972) 6 Cal.3d 595, 601.) In determining which map should be used for the interim elections, this court must consider (1) what maps are reasonably and practically available, and (2) the pros and cons of each potentially viable map in light of the constitutional scheme and criteria set out in recently amended article XXI of the California Constitution. If, after so analyzing each of the potential maps, the court concludes that a map other than the one currently being implemented by election officials should be used for the upcoming 2012 elections in the event the proposed referendum qualifies for the ballot, this court would direct election officials to employ a "dual track" planning process during the remainder of the signature verification process. Officials would thus be able to proceed with the current district maps if the referendum does not qualify for the ballot, but would be ready to use the alternative voting districts should the proposed referendum qualify for the ballot.

As we explain, in the present case four alternative maps have been proposed for use in the 2012 elections in the event the referendum qualifies for the ballot: the three maps proposed by petitioner and the Commission's certified state Senate district map. After reviewing the pros and cons of each of these proposed alternatives in light of the constitutional scheme and criteria, we conclude, for the reasons discussed below, that the Commission's certified map is clearly the most appropriate map to be used in the 2012 state Senate elections even if the proposed referendum qualifies for the ballot.

Accordingly, after first confirming that we properly may exercise jurisdiction in this matter and that the petition presents issues sufficiently ripe for review, we conclude that if the proposed referendum qualifies for the November 2012 general election ballot and stays the Commission's certified state Senate map, the Commission's state Senate map should be used on an interim basis for the June and November 2012 elections, pending the outcome of the referendum. If the proposed referendum does not qualify for the ballot, the Commission's state Senate map will continue to be used for the 2012 election and future elections until replaced pursuant to article XXI of the state

5

Constitution by new maps drawn by a future newly constituted Commission following the 2020 census.

## I. *Background, procedure,*<br>*and summary of conclusions*

Article XXI of the California Constitution, as amended by ballot measures approved by the electorate in November 2008 (Prop. 11, the Voters First Act) and November 2010 (Prop. 20), removes the task of redistricting from the Legislature and gives it to the newly created Citizens Redistricting Commission. (Cal. Const., art. XXI, §§ 1 & 2.) The Commission is required to adjust the boundary lines of California's state Senate, state Assembly, congressional, and State Board of Equalization voting districts "[i]n the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade . . . ." (*Id*., art. XXI, § 1.)

The membership of the Commission selected to create new districts in light of the 2010 census was finalized in late 2010, and in the first eight months of 2011 the Commission held more than 70 business meetings and 34 public hearings in 32 cities throughout the state. The Commission produced draft statewide maps on which it sought and responded to public comment, and finally, in mid-August 2011, it approved and certified all four required maps. (We describe the Commission's structure and process and the requirements of article XXI in greater detail *post*, part II.) Two challenges to the Commission's certifications were initiated shortly thereafter.

First, and roughly contemporaneously with certification by the Commission, an organization designated Fairness and Accountability in Redistricting (FAIR), a Republican-funded entity,[5] was established. Under FAIR's sponsorship, Julie

---

[5] See <http://www.fairdistricts2012.com> (as of Jan. 27, 2012). FAIR is not mentioned in the petition itself, but the petition states: "Republicans have sponsored and funded the referendum against the Commission's Senate plan."

Vandermost, a registered California voter and the petitioner in this proceeding, initiated the process of attempting to qualify a referendum measure, challenging the state Senate map, for placement on the November 2012 general election ballot.**6** After the Attorney General prepared a title and summary of the proposed referendum for inclusion on the referendum petitions, FAIR commenced soliciting referendum petition signatures, which were due for submission by November 13, 2011. (Cal. Const., art. XXI, § 2, subd. (i).)

Second, in September 2011, while the proposed referendum petition was circulating for signatures, two petitions for writ of mandate were filed in this court challenging the Commission's state Senate and congressional district maps on numerous constitutional and statutory grounds, and seeking to bar the Secretary of State from implementing either map. (See Cal. Const., art. XXI, § 3, subd. (b)(2) (hereafter article XXI, § 3(b)(2)) [authorizing such suits].) The petition in *Vandermost v. Bowen* (Sept. 16, 2011, S196493), challenged the Commission's certified state Senate map; the petition in *Radanovich et al. v. Bowen* (Sept. 29, 2011, S196852), challenged the Commission's certified congressional map. After preliminary briefing (see Cal. Rules of Court, rule 8.487) and thorough consideration of all the issues raised by petitioners, we determined that the petitions lacked merit and denied the requested writs on October 26, 2011.**7**

---

**6** The constitutional provision permits earlier ballot submission of a referendum to the voters if a special election is called by the Governor. (Cal. Const., art. XXI, § 2, subd. (i), referring to art. II, § 9, subd. (c); see also Elec. Code, § 9016, as amended by Stats. 2011, ch. 558, § 1, approved by the Gov. on Oct. 7, 2011 [providing that all initiatives and referendum measures that are certified for the ballot on or after July 1, 2011, will be placed on the ballot only at a Nov. statewide general election or at a statewide special election].)

**7** The 126-page petition in *Vandermost v. Bowen* (Sept. 16, 2011, S196493) sought issuance of a writ directed to the Secretary of State, as the chief elections officer, commanding her to refrain from implementing the Commission's certified maps for the Senate districts, and to refrain from taking any other action to hold, or to order county

(*Footnote continued on following page*)

Thereafter FAIR completed the signature-gathering process and timely submitted referendum petition signatures to county election officials immediately prior to the November 13, 2011 filing deadline. On November 23, 2011, the Secretary of State confirmed that at least 504,760 "raw" (unverified) referendum petition signatures had been submitted by FAIR, and ordered county election officials to determine, by random sampling, the number of qualified signers and to certify that result to the Secretary.[8]

On December 2, 2011, Vandermost filed the present petition,[9] asserting that approximately 710,000 referendum signatures have been collected, and that in view of

---

(*Footnote continued from previous page*)

officials to hold, any election using the Commission's certified Senate maps. Petitioner asserted that the maps violate state constitutional criteria for voting districts, set out in article XXI, section 2, subdivision (d) of the California Constitution, concerning contiguity, geographic integrity, and compactness, and that they failed to afford Latino/Hispanic voters an opportunity to elect candidates of choice under sections 2 and 5 of the federal Voting Rights Act (42 U.S.C. § 1973 et seq.). Petitioner also requested the immediate appointment of special masters to "advise the Court on the instant petition," and if the court found the Senate maps to be unconstitutional, she requested that this court direct the special masters to draw new district boundaries for the Senate. Although the cover page of the petition requested an emergency stay, the petition did not set forth a separate plea for emergency relief. In acting on the petition, we assumed that petitioner sought to stay any action on the part of the Secretary of State to implement the Commission's certified state Senate map. Our order denying the petition read: "The requests of petitioner and real party in interest for judicial notice are granted. [¶] The motion of real party in interest to strike the declarations of Dr. T. Anthony Quinn is denied. [¶] The petition for a writ of mandate is denied. [¶] The request for an emergency stay is denied."

[8] Statutory schedules concerning the timing for such events, and related statutory procedures, are described *post*, part III.

[9] Petitioner is represented in this matter, as she was in the petition filed in this court in September, by Charles H. Bell, Jr., of the Sacramento law firm Bell, McAndrews & Hiltachk, LLP. The firm's Web site identifies Mr. Bell as general counsel to the California Republican Party. (See <http://www.bmhlaw.com/index.htm> [as of Jan. 27, 2012].)

8

the circumstance that 504,760 valid signatures are required to qualify the proposed referendum for the November 2012 ballot,[10] the referendum is "likely to qualify and stay timely implementation of the [state Senate] map" and hence she is entitled to seek "relief" under article XXI, section 3(b)(2).[11]

The petition seeks immediate relief,[12] as well as future contingent relief that would be triggered in the event the proposed referendum actually qualifies for placement on the ballot. The contingent relief sought by the petition would take effect only after county

[10]    See California Constitution, article II, section 9, subdivision (b) (requiring a petition "certified to have been signed by electors equal in number to 5 percent of the votes for all candidates for Governor at the last gubernatorial election").

[11]    Article XXI, section 3(b)(2) reads in relevant part: "Any registered voter in this state may . . . file a petition for a writ of mandate or writ of prohibition to seek relief where a certified final map is subject to a referendum measure that is likely to qualify and stay the timely implementation of the map."

[12]    With respect to immediate relief, the petition seeks an order granting (1) suspension of statutory filing fees (Elec. Code, §§ 8103-8105) and related "in lieu-filing-fee petition" procedures for candidates who wish to submit signatures in lieu of paying filing fees (Elec. Code, § 8106, subd. (a)(7)), which procedures would otherwise have commenced on December 30, 2011; and (2) appointing an expert or special master or masters to serve in effect in a "standby/advisory" role by advising the court on "the process of determining interim Senate Districts for 2012."

The petition also seeks a third form of immediate relief, amounting to a request for an immediate preliminary stay of the Commission's Senate map. The petition asserts that "[t]he [submitted referendum] petitions contain sufficient 'raw' signatures to suspend temporarily the implementation of" the Commission's state Senate map and it seeks as immediate relief an order "prohibiting the Secretary of State and county election officials acting at her direction from implementing" that map "for the June 5, 2012 primary election, until [a] new interim Senate map [has] been implemented by this Court." Elsewhere the petition asserts that the Secretary of State's November 23, 2011, order finding an adequate number of raw signatures and directing county election officials to commence random sampling "immediately suspends the operation of the Commission-certified Senate maps until such time as the signature verification process is complete." Such a preliminary stay of the Commission's certified state Senate map would force county election officials to immediately halt preelection planning that they have undertaken and continue to undertake in preparation for the June 2012 primary election.

9

election officials and the Secretary of State finish the time-consuming, statutorily governed process needed to determine whether the proposed referendum actually is supported by the requisite number of valid signatures and hence qualifies for the ballot — a process that may take approximately nine to 17 weeks following submission of petition signatures.[13]  If the referendum qualifies, the Commission's certified Senate map would automatically be stayed by operation of law.[14]  Petitioner asks that, in the event the proposed referendum qualifies for the ballot, this court should establish new interim state Senate district maps for the June and November 2012 state Senate elections by either (1) using the old state Senate map created by the Legislature in 2001; or (2) creating a new state Senate map by "nesting" two adjacent Commission-certified Assembly districts within one Senate district; or (3) establishing a different new state Senate map based on a proposal by petitioner's redistricting consultant, addressing alleged "deficiencies . . . in the Commission's Senate map."

On December 9, 2011, we denied the request for all immediate relief pending this court's eventual decision in this matter, issued an order to show cause concerning the prayer for future contingent relief, and granted a motion by the Commission to intervene. We established an extremely expedited briefing schedule, designed to permit this court to conduct oral argument by early January 2012, and file an opinion by the end of that month.  We also specified additional issues for briefing, expressly reserving resolution of the threshold question of jurisdiction for our eventual written decision.[15]

_____

[13]   Statutory schedules concerning the timing for such events, and related statutory procedures, are described *post*, part III.

[14]   See *post*, part III.

[15]   Our December 9, 2011, order stated:

(*Footnote continued on following page*)

10

(*Footnote continued from previous page*)

"In light of the short time frame imposed by the impending 2012 electoral cycle, and the need to clarify the districts that are to be used in conducting the primary and general elections for the California Senate in 2012 should the referendum petitions that have been filed with the Secretary of State prove sufficient to qualify the referendum for placement on the November 2012 ballot and to stay the Senate redistricting map drawn and certified by the Citizens Redistricting Commission, the court has determined that it is appropriate to issue an order to show cause in this matter at this juncture, while reserving the question of this court's jurisdiction for resolution in our eventual decision in this proceeding.

"In addition to addressing issues relating to what relief, if any, this court should order in the event the referendum regarding the Senate redistricting map qualifies for the November 2012 ballot, the parties are directed to address the following jurisdictional issues:  (1) What standard or test should this court apply in determining whether a referendum is 'likely to qualify' within the meaning of article XXI, section 3, subdivision (b)(2) of the California Constitution, for purposes of deciding when a petition for writ of mandate may be filed in this court under that constitutional provision?  (2) Is this court's authority to entertain a petition for writ of mandate prior to the formal qualification of a referendum petition limited to the circumstances set forth in article XXI, section 3, subdivision (b)(2), or does this court have other authority (including inherent authority) to entertain such a petition even if it cannot yet be determined whether such a referendum is 'likely to qualify' for placement on the ballot?

"The motion of the Citizens Redistricting Commission to intervene in this proceeding and for leave to file preliminary opposition is granted.

"To the extent the petition filed in this matter seeks any interim relief pending this court's eventual decision in this matter, the request for any such interim relief is denied.

"Petitioner's request for judicial notice filed on December 2, 2011, is granted.

"To facilitate this court's conducting of oral argument in this matter as early as the first two weeks in January 2012, and the filing of an opinion in this matter as early as the end of January 2012, the court orders an extremely expedited briefing schedule, as follows:

"Respondent and intervener Citizens Redistricting Commission are each directed to serve and file a return or opposition to the order to show cause on or before Wednesday, December 14, 2011.

"Petitioner may serve and file a reply to the return or opposition on or before Monday, December 19, 2011.

"Any application to file an amicus curiae brief and any amicus curiae brief may be served and filed on or before Wednesday, December 21, 2011.

(*Footnote continued on following page*)

Having considered the subsequent briefing and oral argument, we conclude as follows: (1) This court has jurisdiction to entertain this writ proceeding and it is sufficiently ripe for our review. (2) In the event the referendum eventually qualifies for presentation to the voters on the November 2012 ballot, triggering a stay of the Commission's certified state Senate map by operation of law, election officials are nonetheless directed to use the boundaries set out in the Commission-certified state Senate map on an interim basis for the June 2012 primary election and November 2012 general election, pending a vote by the people on the proposed referendum at the November 2012 election.

## II. *California Constitution, amended article XXI and the Citizens Redistricting Commission*

We first briefly describe the structure and workings of the Citizens Redistricting Commission.

Prior to 2008, redistricting in California was performed by the Legislature subject to the veto power of the Governor — or by the courts, when the Legislature and Governor could not agree. (See, e.g., *Legislature v. Reinecke* (1973) 10 Cal.3d 396; *Wilson v. Eu* (1992) 1 Cal.4th 707.) The electorate, however, dramatically changed the process by ballot measures in 2008 and 2010. Those measures amended California Constitution, article XXI, transferring the redistricting task to a newly created Citizens Redistricting Commission. (Prop. 11, as approved by voters, Gen. Elec. (Nov. 5, 2008)

---

(*Footnote continued from previous page*)

"Any reply or consolidated reply to any amicus curiae brief or briefs may be served and filed on or before Thursday, December 22, 2011.

"All service and filings may be made by facsimile with the original and hard copies to follow by mail. The court's fax number is (415) 865-7183.

"No extension of time will be granted."

(Proposition 11); Prop. 20, as approved by voters, Gen. Elec. (Nov. 2, 2010) (Proposition 20).)

### A. *Charge and selection of the Commission*

California Constitution, article XXI, section 2 establishes the Commission and defines how it is to be constituted. The constitutional provision creates a body that excludes career politicians, reflects citizen participation at every level, and is expected to rise above partisanship. Accordingly, subdivision (b) of section 2 charges the Commission with "conduct[ing] an open and transparent process enabling full public consideration of and comment on the drawing of district lines; . . . draw[ing] district lines according to the redistricting criteria specified in this article; and . . . conduct[ing] themselves with integrity and fairness." Section 2, subdivision (c)(1) of article XXI further provides that "[t]he selection process is designed to produce a commission that is independent from legislative influence and reasonably representative of this State's diversity."

The Commission has 14 members. Five must be registered with the largest political party in California (based on voter registration), five must be registered with the second largest political party in California, and four must be individuals who are not registered with either of the two largest political parties. (Cal. Const., art. XXI, § 2, subd. (c)(2).) Commission members are ineligible to hold elective public office at the federal, state, county or city level for a period of 10 years, beginning from the date of their appointment to the Commission (*id*., art. XXI, § 2, subd. (c)(6)), and, for a five-year period beginning from their appointment, are ineligible to hold appointive federal, state, or local public office, or to serve as paid staff for, or as a paid consultant to, the State Board of Equalization, Congress, the Legislature, or any individual legislator, or to register as a federal, state or local lobbyist in California. (*Ibid.*)

Government Code section 8250 et seq., enacted by the voters in 2008 as part of Proposition 11, governs the process for selecting commissioners. Government Code

13

section 8252[16] sets forth how the commissioners are to be selected.  The State Auditor, an office that is independent of the legislative and executive branches (§ 8546), initiates an application process, open to all registered voters, that is designed to "promote[] a diverse and qualified applicant pool."  (§ 8252, subd. (a)(1).)  According to the Commission's Final Report on Redistricting, August 15, 2011 (Final Report), the State Auditor "undertook a significant outreach process throughout the state utilizing a wide variety of communications media, including mainstream and ethnic media, social media, a website, and staff assigned to respond to all telephone calls and e-mails."  (Final Rep., at p. 2, available on the Commission's Web site, <http://wedrawthelines.ca.gov> [as of Jan. 27, 2012].)  Section 8252, subdivision (a)(2) authorizes the State Auditor to remove from the pool those applicants with a conflict of interest.  Subdivisions (a)(2)(A) and (a)(2) (B) of section 8252 identify the relationships that can create a conflict of interest.

Section 8252 also authorizes the State Auditor to establish an "Applicant Review Panel" to screen the applicants.  (§ 8252, subd. (b).)  The panel consists of three independent auditors randomly drawn from a pool comprised of "all auditors employed by the state and licensed by the California Board of Accountancy at the time of the drawing" (*ibid.*); one of the three must be registered with the largest political party in California, one must be registered with the second largest political party in California, and the third must not be not registered with either of those two parties.  (*Ibid.*) Prospective panel members are to be screened for conflicts of interest under the same set of standards that are applied to applicants.  (§ 8252, subd. (a)(2).)  Once the panel is constituted, the State Auditor provides it with the applications of prospective commission members.  (§ 8252, subd. (c).)

---

[16]    Subsequent unlabeled statutory references in this part (pt. II) and in part III are to the Government Code.

14

The panel then selects "60 of the most qualified applicants," 20 of whom must be registered with the largest political party; 20 must be registered with the second largest political party; and the final 20 must not be registered with either of those two parties. (§ 8252, subd. (d).) Selection is to be made on the basis of "relevant analytical skills, ability to be impartial, and appreciation for California's diverse demographics and geography." (*Ibid.*) The panel presents its pool of recommended applicants to the Secretary of the Senate and to the Chief Clerk of the Assembly, and those officers, in turn, permit the President pro Tempore of the Senate, the Minority Floor Leader of the Senate, the Speaker of the Assembly, and the Minority Floor Leader of the Assembly each to strike up to two applicants from each subpool of 20, for a total of eight strikes per subpool. (§ 8252, subd. (e).) The State Auditor then randomly draws eight names from the remaining pool of applicants: three from the subpool of applicants registered with the largest political party, three from the subpool registered with the second largest political party, and two from the remaining subpool. These eight individuals serve on the Commission. (§ 8252, subd. (f).) They, in turn, review the remaining pool of applicants and appoint a final six to complete the Commission: two are to be drawn from the subpool of those registered with the largest political party, two are to be drawn from the subpool of those registered with the second largest political party, and two are to be drawn from the remaining subpool. The six appointees must be approved by at least five affirmative votes of the original eight commissioners; those five votes must include the votes of two Commissioners registered with the largest political party, two Commissioners registered with the second largest political party, and one from a Commissioner not registered with either party. (§ 8252, subd. (g).) The six appointees are to be "chosen to ensure the commission reflects this state's diversity, including, but not limited to, racial, ethnic, geographic, and gender diversity." (*Ibid*.) The Commission, however, need not comply with any specific ratio or formula. (*Ibid.*)

15

B. *The redistricting process*

California Constitution, article XXI, section 2, subdivision (b) and related statutes establish a public redistricting process. The constitutional provision requires the Commission to "conduct an open and transparent process enabling full public consideration of and comment on the drawing of district lines." Section 8253 implements that charge, and requires the Commission to "establish and implement an open hearing process for public input and deliberation that shall be subject to public notice and promoted through a thorough outreach program to solicit broad public participation in the redistricting public review process. The hearing process shall include hearings to receive public input before the commission draws any maps, and hearings following the drawing and display of any commission maps. In addition, hearings shall be supplemented with other activities as appropriate to further increase opportunities for the public to observe and participate in the review process. The commission shall display the maps for public comment in a manner designed to achieve the widest public access reasonably possible. Public comment shall be taken for at least 14 days from the date of public display of any map." (§ 8253, subd. (a)(7).)

The Commission was sworn in during the month of January 2011, and conducted an open bidding process to hire independent counsel and experts to advise it on matters related to the federal Voting Rights Act of 1965 (42 U.S.C. § 1973 et seq.) (Voting Rights Act) and technical issues. It thereafter held more than 70 business meetings and 34 public hearings in 32 cities throughout the state. (Final Rep., at p. 4.) Generally, the Commission's hearings were scheduled in the early evening hours at school or government locations in the center of a community, making it convenient for "average citizens" to participate. (*Ibid.*) It regularly allowed public input and comment at its business meetings as well. (*Ibid.*) Its educational materials were broadly distributed in English and six other languages (Spanish, Chinese, Japanese, Korean, Tagalog, and Vietnamese), and it ultimately received, in addition to oral testimony, more than 2,000

16

written submissions, including maps reflecting statewide, regional, or other districts. (*Ibid.*; see also Final Rep., at pp. 3-5 [listing representative groups providing submissions and other testimony].) The Commission's staff received "written comments, input and suggestions from more than 20,000 individuals and groups." (*Id.*, at p. 5.) The Commission held 23 public input hearings before issuing a set of its draft maps in June of 2011. After a five-day public review period, it held 11 more public input hearings around the state to collect reactions to and comments concerning those draft maps. (*Ibid.*) It held 22 business meetings in Sacramento to discuss the draft maps, at which more than 276 people appeared and commented. All of the Commission's public meetings were "live-streamed," captured on video, and placed on the Commission's Web site for public viewing. All of the Commission's completed documents, and those of its staff, were posted on the Commission's Web site for public viewing as well. (*Ibid.*) All such materials remain archived on the Commission's Web site, <http://wedrawthelines.ca.gov> (as of Jan. 27, 2012).

Pursuant to California Constitution, article XXI, section 2, subdivision (c)(5), the structure of the Commission's vote on each map mirrored the balanced process described above, under which the Commission's members were selected. An affirmative vote on each map was required to be supported by a supermajority of at least nine Commission members, including three from each subpool of members: those registered with the largest political party in California (that is, three Democrats), those registered with the second largest political party (that is, three Republicans), and three who are not registered with either major party. With regard to the state Senate map — the subject of the proposed referendum — the Commission's vote was 13 to 1 in favor.

## C. *Redistricting criteria*

California Constitution, article XXI, section 2, subdivision (d) requires the Commission to "establish single-member districts for the Senate, Assembly, Congress, and State Board of Equalization pursuant to a mapping process" that complies with

17

criteria expressly set forth in article XXI itself.  It is of considerable consequence to our analysis that the constitutional provision ranks the applicable criteria by order of priority.

First, "[d]istricts shall comply with the United States Constitution.  Congressional districts shall achieve population equality as nearly as is practicable, and Senatorial, Assembly, and State Board of Equalization districts shall have reasonably equal population with other districts for the same office, except where deviation is required to comply with the federal Voting Rights Act or allowable by law."  (Cal. Const., art. XXI, § 2, subd. (d)(1).)

Second, "[d]istricts shall comply with the federal Voting Rights Act (42 U.S.C. Sec. 1971 and following)."  (Cal. Const., art. XXI, § 2, subd. (d)(2).)

Third, "[d]istricts shall be geographically contiguous."  (Cal. Const., art XXI, § 2, subd. (d)(3).)

Fourth, the Commission's maps must respect "[t]he geographic integrity of any city, county, city and county, local neighborhood, or local community of interest . . . in a manner that minimizes their division to the extent possible without violating the requirements of any of the preceding subdivisions."  (Cal. Const., art. XXI, § 2, subd. (d)(4).)  The Constitution defines a "community of interest" as "a contiguous population which shares common social and economic interests that should be included within a single district for purposes of its effective and fair representation."  (*Ibid.*) "Examples of such shared interests are those common to an urban area, a rural area, an industrial area, or an agricultural area, and those common to areas in which the people share similar living standards, use the same transportation facilities, have similar work opportunities, or have access to the same media of communication relevant to the election process."  (*Ibid.*)  The term "communities of interest" expressly excludes "relationships with political parties, incumbents, or political candidates."  (*Ibid.*)

Fifth, "[t]o the extent practicable, and where this does not conflict with the criteria above, districts shall be drawn to encourage geographical compactness such that nearby

18

areas of population are not bypassed for more distant population."  (Cal. Const., art. XXI, § 2, subd. (d)(5).)

Sixth, and finally, "[t]o the extent practicable, and where this does not conflict with the criteria above, each Senate district shall be comprised of two whole, complete, and adjacent Assembly districts, and each Board of Equalization district shall be comprised of 10 whole, complete, and adjacent Senate districts."  (Cal. Const., art. XXI, § 2, subd. (d)(6) [commonly referred to as the "nesting" goal].)

Subdivision (e) of article XXI, section 2, provides that "[t]he place of residence of any incumbent or political candidate shall not be considered in the creation of a map. Districts shall not be drawn for the purpose of favoring or discriminating against an incumbent, political candidate, or political party."

Subdivision (f) of article XXI, section 2, provides that "[d]istricts for the Congress, Senate, Assembly, and State Board of Equalization shall be numbered consecutively commencing at the northern boundary of the State and ending at the southern boundary."

These criteria are derived, for the most part, from the standards developed by the special masters appointed by this court in 1973 after the Legislature failed to pass legislative and congressional redistricting bills that were acceptable to the Governor. (*Legislature v. Reinecke, supra,* 10 Cal.3d at pp. 400-402.)  This court approved the use of these criteria in *Legislature v. Reinecke*, and they subsequently were added to the Constitution as article XXI when the voters approved Proposition 6 in 1980.  The current version of article XXI, as amended by the voters in 2008 (Prop. 11) and again in 2010 (Prop. 20), expands upon the original criteria articulated by the special masters in 1973, based, in large part, on decisions of this court applying the criteria developed by the special masters.  (See, e.g., *Wilson v. Eu, supra,* 1 Cal.4th 707.)  Unlike former article XXI, section 2, or the judicial decisions on which that provision was based, however, the current version of article XXI, in section 2, subdivision (d), expressly ranks the criteria in

19

order of priority, stating explicitly that a lower-ranked criterion is to be followed only when doing so does not conflict with a higher-ranked criterion or criteria.

### III. *Did this court have authority to issue an order to show cause in this original writ proceeding in the absence of a showing that the proposed referendum was "likely to qualify" for the ballot?*

*And does this court at this juncture have authority to determine which state Senate district map should be used in the event the referendum qualifies for the ballot and stays the operative effect of the Commission-certified state Senate map?*

In considering petitioner's request for relief, we must first address the threshold question whether this court had authority to issue an order to show cause in this original writ proceeding in the absence of a showing by petitioner that the proposed referendum was "likely to qualify" for the ballot. In her preliminary opposition to the petition, filed prior to this court's consideration of the petition, the Secretary of State maintained that the petition in this proceeding was not properly filed and should be summarily denied because petitioner had not demonstrated that the underlying proposed referendum was "likely to qualify" for the ballot within the meaning of article XXI, section 3(b)(2) of the California Constitution. We will analyze this threshold question in light of the circumstances that were before this court on December 9, 2011, when we issued the order to show cause, both to explain why this court's December 9 action was authorized and appropriate, and, as importantly, to provide guidance on this procedural point for the future in the event similar circumstances arise in the course of subsequent redistricting efforts.

As we will explain, we conclude the petition's allegations adequately invoked our traditional extraordinary writ authority under article VI, section 10 of the state Constitution over a question that was, and is, ripe for our decision. For this reason, it is not necessary for this court to apply the language in article XXI, section (3)(b)(2)

providing that a "registered voter . . . may file . . . a petition for a writ of mandate . . . to seek relief where a certified final map is subject to a referendum measure that is likely to qualify and stay the timely implementation of the map." (Cal. Const., art. XXI, § 3(b)(2).)

As noted above, the petition filed in this case on December 2, 2011, stated that the proponents of the referendum had submitted a total of approximately 710,000 raw (unverified) signatures in support of the referendum to local election officials throughout the state. The petition asserted that because only approximately 504,000 valid signatures were required to qualify the referendum for the ballot, the number of signatures that had been submitted established that the proposed referendum was "likely to qualify" for placement on the November 2012 ballot and thus that the petition was properly filed under the provisions of article XXI, section 3(b)(2) of the California Constitution and should be entertained and acted on by this court. Article XXI, section 3(b)(2) provides in this regard that "[a]ny registered voter . . . *may file* . . . a petition for a writ of mandate . . . to seek relief *where a certified final map is subject to a referendum measure that is likely to qualify* and stay the timely implementation of the map." (Italics added.)

As also noted above, the preliminary opposition filed by the Secretary of State took issue with the petition's contention that the number of raw signatures that had been submitted to election officials established that the proposed referendum was likely to qualify for the ballot. The preliminary opposition pointed out that in the prior separate mandate proceeding filed in this court (see *ante*, fn. 7 and related text), petitioner had asserted that she anticipated obtaining more than 780,000 raw signatures on the referendum petition but that petitioner instead submitted only approximately 710,000 raw signatures. The preliminary opposition, noting that a 2008 study of initiative petitions reported that initiative proponents "lose up to 40 [percent] of gross signatures in the verification check" (citing Center for Governmental Studies, Democracy by Initiative: Shaping California's Fourth Branch of Government (2d ed. 2008) p. 149), asserted that

21

given the relatively low number of raw signatures that had been submitted, it was too soon to tell whether the proposed referendum was likely to qualify for placement on the November 2012 ballot. For this reason, the Secretary of State took the position that the petition was not properly filed and should be summarily denied.

As we have pointed out (*ante*, at p. 10), our order to show cause in this matter specifically reserved resolution of this threshold issue for our eventual opinion and directed the parties to brief two questions related to this issue, regarding (1) the test or standard this court should apply in determining whether a proposed referendum is "likely to qualify" within the meaning of article XXI, section 3(b)(2), and (2) whether this court's authority to entertain a petition for a writ of mandate prior to the formal qualification of a referendum petition is limited to the circumstances set forth in article XXI, section 3.[17]

The briefs responding to the order to show cause filed by the Secretary of State and the Commission argued that in order to comply with the "likely to qualify" provision of article XXI, section 3(b)(2), a petitioner must demonstrate by "a preponderance of the evidence" that it is "more probable than not" that the referendum petition will qualify for placement on the ballot. Both briefs further contended that because the relatively low number of raw signatures submitted in support of the proposed referendum left it unclear whether there was a sufficient number of valid signatures to qualify the referendum for the ballot, petitioner failed to meet the "likely to qualify" standard. In addition, both asserted that if the petition failed to satisfy the "likely to qualify" standard set forth in article XXI, section 3(b)(2), this court lacked authority to entertain the mandate proceeding. Accordingly, both maintained that the petition should be dismissed on this basis.

---

[17] The two questions are reproduced in full *ante*, footnote 15.

22

In her reply, petitioner disagreed with the proposed interpretation of the "likely to qualify" language, arguing that in light of the provision's purpose, the phrase "likely to qualify" should not be interpreted to mean that a petition for writ of mandate may be filed *only* when it can be shown that it is "more probable than not" that a proposed referendum will qualify for placement on the ballot, but instead that such a petition may be filed on a lesser showing. (The reply did not specify or quantify the lesser showing that petitioner believes is contemplated by the "likely to qualify" language.) In addition, the reply maintained that, in any event, the number of raw signatures that had been submitted in support of the proposed referendum was sufficient to establish that it was more probable than not that the referendum would qualify. Finally, the reply asserted that, apart from article XXI, section 3(b)(2), this court possesses authority under article VI, section 10 of the Constitution — establishing this court's original jurisdiction "in proceedings for extraordinary relief" — to entertain the petition for a writ of mandate in this case because the petition presented a matter of great public importance that had to be resolved promptly in light of the impending 2012 electoral cycle.

For the reasons discussed below, we conclude that there is no need for this court to decide the meaning of the term "likely to qualify" as used in article XXI, section 3(b)(2) or to determine whether the "likely to qualify" standard of section 3(b)(2) was satisfied at the time the petition in this case was filed or is satisfied at the present time. As we explain, in light of the statewide importance of the issue presented by the petition and the need for an expeditious judicial resolution of this matter, this court had authority, under article VI, section 10 of the California Constitution, to issue an order to show cause in this original writ proceeding at the time the petition was filed and also possesses the authority at the present time to determine, through the exercise of its original writ jurisdiction, what state Senate district map should be used as an interim measure if the

23

proposed referendum qualifies.[18]  The sentence of article XXI, section 3(b)(2) in question — containing the "likely to qualify" language — was not intended, and cannot reasonably be interpreted, to limit or restrict this court's authority under article VI, section 10 to determine that such an original writ proceeding is appropriately ripe for adjudication and resolution at an earlier point in time.  As the facts of this case illustrate, in light of the great public interest and exigencies of the electoral process, this court may need to assume jurisdiction and act expeditiously when such a petition is filed if the court is to retain the ability to render a meaningful decision that can be realistically implemented.  This is so even under circumstances in which it cannot reasonably be predicted whether the proposed referendum is likely to qualify for the ballot.  Nothing in the background or purpose of article XXI, section 3(b)(2) suggests that the provision was intended to deprive this court of its fundamental and long-standing constitutional authority to accept such a filing and to act in such a setting when the court determines that it is appropriate and prudent to do so.

In analyzing this issue, it is important to recognize at the outset that it is firmly established that this court possesses "jurisdiction," *in the fundamental sense*, to entertain a petition for an original writ of mandate that is directed to the Secretary of State and concerns her official duties related to the electoral process, and to grant appropriate relief in such a proceeding.  Article VI, section 10 of the California Constitution explicitly provides in this regard that this court possesses "original jurisdiction in proceedings for

---

[18]    Although the petition in this case asserted that it was filed under the authority granted by article XXI, section 3(b)(2), the representations disclosed by the petition demonstrated that petitioner, as a registered voter and the official proponent of the proposed referendum in question, unquestionably had standing to file a petition for an original writ of mandate seeking the relief in question under the so-called "public-interest exception" applicable to mandate proceedings.  (See, e.g., *Hollman v. Warren* (1948) 32 Cal.2d 351, 356-357; see generally 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 84, pp. 970-973, and cases cited.)

24

extraordinary relief in the nature of mandamus, certiorari, and prohibition," and this court has long exercised such original extraordinary writ jurisdiction with respect to public officials' exercise of their official conduct. (See, e.g., *Hollman v. Warren*, *supra*, 32 Cal.2d at pp. 354-357; see generally *People ex rel. S.F. Bay etc. Com. v. Town of Emeryville* (1968) 69 Cal.2d 533, 537-538 [discussing 1966 state constitutional amendment that "deliberately broadened the constitutional language relating to jurisdiction in extraordinary writ proceedings"].) In past cases, this court has repeatedly exercised authority to entertain and decide petitions for original writs of mandate related to the referendum, initiative, and redistricting process in circumstances in which an expeditious ruling was necessary to the orderly functioning of the electoral system. (See, e.g., *Senate v. Jones* (1999) 21 Cal.4th 1142; *Wilson v. Eu* (1991) 54 Cal.3d 546; *Wilson v. Eu, supra,* 1 Cal.4th 707; *Assembly v. Deukmejian*, *supra,* 30 Cal.3d 638; *Legislature v. Reinecke, supra*, 10 Cal.3d 396; *Silver v. Brown* (1965) 63 Cal.2d 270.)

Accordingly, we disagree with the Secretary of State's and the Commission's argument and analysis regarding this court's alleged lack of authority to issue an order to show cause in this writ proceeding in light of the petition's asserted failure to establish that the proposed referendum was likely to qualify for the ballot. Properly analyzed, the issue does not implicate this court's fundamental jurisdiction over petitioner's mandate action. Rather, the issue presents a question of the "justiciability" of petitioner's claim, and, more specifically, whether the action is "ripe" for adjudication under the "ripeness" doctrine that constitutes one aspect of justiciability. As this court explained in *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170: "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve

25

specific legal disputes.  However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.  On the other hand, *the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question.*  [Citations.]" (Italics added.)  As the Court of Appeal observed in *California Water & Tel. Co. v. Los Angeles* (1967) 253 Cal.App.2d 16, 22, "[a] controversy is 'ripe' when it has reached . . . the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made."

In past cases this court has repeatedly held that this court may appropriately exercise its jurisdiction over a petition for an original writ of mandate when "the issues presented are of great public importance and must be resolved promptly."  (*County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 845; see, e.g., *Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 808; see generally 8 Witkin, Cal. Procedure, *supra,* Extraordinary Writs, § 146, pp. 1043-1046.)  We have frequently found challenges ripe for the invocation and exercise of our original writ jurisdiction under this standard in cases involving significant legal issues affecting the electoral process, when a speedy resolution of the underlying controversy is necessary to avoid a disruption of an upcoming election.  (See, e.g., *Wilson v. Eu, supra,* 54 Cal.3d at pp. 472-473; *Assembly v. Deukmejian, supra,* 30 Cal.3d at p. 646; *Thompson v. Mellon* (1973) 9 Cal.3d 96, 98; *Legislature v. Reinecke* (1972) 6 Cal.3d 595, 598; *Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 570, fn. 1; *Silver v. Brown, supra,* 63 Cal.2d at pp. 277-278; *Perry v. Jordan* (1949) 34 Cal.2d 87, 90-91.)

In this case, the legal issue posed by the petition plainly presented a question of significant statewide public importance.  The petition noted that a referendum petition,

26

challenging the state Senate redistricting map that had been certified by the Commission and that was currently being implemented by election officials throughout the state, had been circulated for signatures and had been timely filed with election officials with a number of raw signatures that was greater than the number of verified signatures required for qualification. The petition also pointed out that if the proposed referendum proves to have a sufficient number of verified signatures to qualify for placement on the November 2012 ballot, the existing Commission-certified state Senate map would, as a matter of law, automatically be stayed pending the electorate's November 2012 vote on the referendum measure. (See Cal. Const., art. II, § 10, subd. (a); *Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 654-657, and cases cited [construing the cited constitutional provision to mean that a "duly qualified referendum" stays implementation of the challenged electoral maps].) And the petition further explained that if the existing state Senate map is stayed by qualification of the proposed referendum, this court would bear the direct responsibility of deciding which state Senate districts are to be used by election officials for the interim June 2012 primary election and November 2012 general election. (*Assembly v. Deukmejian*, *supra*, 30 Cal.3d at pp. 657-658.) Thus, there is no question that the legal issue presented by the petition — what state Senate districts should be used for those elections in the event the proposed referendum qualifies for the ballot — is clearly an issue of sufficient statewide public importance to warrant this court's exercise of its original writ jurisdiction.

At the time the petition was filed, however, the proposed referendum had not yet qualified for the ballot (indeed, at the time of filing this opinion, it still has not qualified), and the question raised by the informal opposition to the petition was whether the matter was sufficiently ripe to render it appropriate for this court to issue an order to show cause, establish a briefing schedule, and proceed to adjudicate the matter, or whether the petition was premature.

As we will explain (see, *post*, at pp. 29-32), both on December 2, 2011 (when the petition for writ of mandate was filed in this court), and on December 9, 2011 (when this court considered whether to issue an order of show cause), it was apparent (1) that it was a close question whether a sufficient number of valid signatures had been filed to qualify the proposed referendum for placement on the November 2012 ballot, and (2) that the ultimate resolution of that question might not be determined until early March 2012. As we also will explain, however, under the circumstances shown by the petition, our timely intervention was critical because of practical impediments faced by election officials preparing for the 2012 election cycle.

Under the applicable California statutes (Elec. Code, § 9030 et seq.), when, as in this case, the proponents of a referendum filed with election officials petitions containing a number of raw signatures greater than the number of valid signatures required for qualification, local election officials were required to conduct a random sampling of the raw signatures to make an initial determination of the percentage of raw signatures that would be found to be valid signatures.[19] Here, the last day for counties to complete random sampling was January 10, 2012. (Elec. Code, § 9030, subds. (d), (e).) Thereafter, based on the county certificates, the Secretary of State was required to determine the statewide result of the random sampling by January 18, 2012. Under the governing statutory provisions, if the random sampling projected a number of total valid signatures that was less than 95 percent of the required number of valid signatures, the petition would fail without any further count. If the projection of valid signatures was 110 percent or more of the required number, the petition would qualify without any

---

[19]     Random sampling is conducted in each county with regard to 3 percent of the signatures presented, or 500 signatures, whichever number is greater. If fewer than 500 signatures are submitted in a county, the county election officials must check each signature. (Elec. Code, § 9030, subd. (d).)

28

further count.  If the projection of valid signatures was between 95 and 110 percent, the Secretary of State would notify counties that a full count of all submitted signatures would be required to verify the number of valid signatures that had been submitted. (Elec. Code, §§ 9030, subds. (f) & (g), 9031, subd. (a).)  If a full count was required, the last day for counties to determine the number of qualified signatures would be March 6, 2012.  (*Id*., § 9031, subds. (b) & (c).)  Thereafter, by March 12, 2012, the Secretary of State would determine whether the referendum petition qualifies for placement on the November 2012 ballot.  (*Id*., §§ 9031, subd. (d), 9033.)

At the time the petition in the present case was filed, *all parties* in this proceeding agreed that the available data indicated that the random sampling of the petition signatures was very likely to result in a projection falling between 95 and 110 percent of the required number of valid signatures.  Thus, although the parties disagreed whether the available data demonstrated that it was more probable than not that the proposed referendum would qualify, the parties agreed that the data established that there was at least a substantial possibility that the referendum would ultimately qualify for the ballot. And because the parties also agreed that it was quite likely that the final result of the random sampling process would mean that the verification process would have to go to a full count of all signatures, at that time it appeared very probable that it would not be definitively known whether the proposed referendum qualified for the ballot until early March 2012.  However, the Secretary of State informed the court that a number of actions for the 2012 electoral cycle were required to begin well before that date.

Thus, at the time the petition was filed and this court had to decide whether to issue an order to show cause, we faced a serious problem of timing and coordination.  As noted in *Wilson v. Eu, supra,* 54 Cal.3d at page 548, "preparing for elections is a complex and 'sequential' process, requiring various tasks be performed before others may begin, including identifying the various district boundaries, developing county election precincts, assigning such districts to all registered voters, designing ballot styles, printing

29

ballots, providing polling places, and training precinct workers. Early delays in one function can impact all other functions. As the Secretary [of State] points out, the need to know precise district boundaries 'is at the front end of the process.' " According to the Secretary of State here, "[t]hese words are particularly applicable to the 2012 election cycle, where elections officials will implement not only new redistricting plans, but also the new 'top two' or 'voter-nominated' election scheme adopted by Proposition 14 (June 2010)."

At the time the petition was filed, all four maps certified in mid-August by the Commission — including the state Senate map — were then the legally applicable maps, and county election officials and the Secretary of State and others were using and relying upon them for purposes of state election planning and "preclearance" under section 5 of the federal Voting Rights Act,[20] and would continue to do so unless and until the state Senate map is automatically stayed by qualification of the proposed referendum or this court orders otherwise. The Secretary of State, citing a declaration by the chief of the elections division, explained that up to six weeks would be required "for state and local elections officials to implement [any] changes [that might be ordered] to the new maps." This court was also informed that the Secretary of State and county election officials needed to know by the end of January 2012 whether they would be required to implement any changes in the state Senate districts in the event the proposed referendum qualifies and automatically stays the Commission-certified state Senate redistricting map.

As the circumstances of the present case demonstrate, even when the available data may be insufficient to show just how likely or probable it is that a proposed referendum will qualify for placement on the ballot, detrimental consequences to the orderly process of an election may result if the court fails to exercise jurisdiction

---

[20]     See *post*, footnote 44.

30

expeditiously and the referendum does ultimately qualify for the ballot. The potential detrimental consequences resulting from this court's deferring action until later in the signature verification process may reasonably support a judicial determination that the proposed mandate action is sufficiently "ripe" to permit this court to exercise jurisdiction over the mandate action at that earlier juncture.

The combination of the redistricting process embodied in California Constitution, article XXI and the electoral schedule often leaves very little time between the deadline for filing referendum petition signatures and the beginning of the numerous tasks that must be undertaken by candidates and election officials during the upcoming primary and general election electoral cycle. Thus, it may be necessary for this court to issue an order to show cause, elicit briefing, and hold oral argument before it can be determined with any substantial degree of accuracy or confidence how likely or probable it is that the proposed referendum will qualify for the ballot. Such immediate action by this court may be essential in order for this court to retain the ability to render a decision (regarding what districts should be used in the event the referendum qualifies) at a time when the court's decision can actually be implemented. If issuance of an order to show cause is deferred until later in the signature-verification process, then by the time a judicial decision ultimately is rendered it may, as a practical matter, be impossible for election officials to use any districts other than the districts that the officials have been utilizing up until the date on which the Commission-certified maps are stayed by the official qualification of the proposed referendum. In other words, if this court were to conclude that other districts should be used in the event the referendum qualifies, it may be too late at that time to apply the court's decision to implement those other districts.

Accordingly, we conclude that, in order to preserve this court's ability to render a meaningful and realistically enforceable decision regarding which districts should be used in the event a proposed referendum qualifies, this court properly may determine that a proposed mandate proceeding is "ripe" for adjudication and may issue an order to show

31

cause in such a proceeding in the absence of a showing that the referendum is "likely to qualify" for placement on the ballot. Given the realities of the timing of redistricting and the statutory electoral process, we hold that this court has authority to find that a mandate action satisfies the ripeness doctrine when we conclude that, in light of the relative probability that the proposed referendum will qualify for the ballot and the time limitations and potential detrimental consequences of refusing to consider a mandate petition at that point in time, it is prudent to issue an order to show cause and decide which districts should be used in the upcoming elections in the event the proposed referendum does qualify for placement on the ballot. (Accord, *People ex rel. S.F. Bay etc. Com. v. Town of Emeryville, supra,* 69 Cal.2d at pp. 537-539 [an appellate court has inherent power to order interim relief in aid of its own jurisdiction and to preserve the effectiveness of its ultimate decision].)

Furthermore, not only may this court *issue an order to show cause* in the absence of a showing that the proposed referendum is "likely to qualify" for the ballot, but this court's authority *to decide what districts should be used in the event the referendum does qualify and to grant relief based upon that decision* also is not contingent upon a showing that the proposed referendum is "likely to qualify" for the ballot. Even when it cannot be determined from the available data how likely it is that a referendum will qualify for the ballot — or when there is a substantial possibility that the proposed referendum will qualify but it is not "more probable than not" that it will qualify — a court may conclude that it is prudent to determine, at that time, which districts should be used in the event the referendum does qualify so that election officials are not left without meaningful guidance if the referendum ultimately qualifies.[21] Thus, at the relief stage, just as at the

---

**21** As explained earlier, current California statutes mandate a full count of all submitted signatures whenever the results of the random sampling process project a signature validity rate between 95 and 110 percent of the required number of valid

(*Footnote continued on following page*)

32

order to show cause stage of an original writ proceeding, this court may properly grant relief before a proposed referendum actually qualifies for the ballot when the court is of the view that there is a sufficient chance that the proposed referendum will qualify to make it prudent for the court to advise election officials of the districts that should be used on an interim basis if the proposed referendum ultimately qualifies for the ballot.

We also emphasize that it is perfectly appropriate for this court, after the issuance of an order to show cause and while such a proceeding is pending before the court, to continue to consider all relevant factors that may affect both the need for relief and the prudence and appropriate timing of affording the relief that the court determines may be warranted.[22]

---

(*Footnote continued from previous page*)

signatures. (*Ante*, at pp. 28-29.) This statutory scheme indicates that even when the random sampling process projects that the number of valid signatures submitted will be only 95 percent of the required number of valid signatures, the Legislature is of the view that there is a sufficient chance that a full count of all signatures will show that the proposed referendum actually has obtained a sufficient number of valid signatures to qualify for the ballot to require that a time-consuming and expensive full count be conducted. Accordingly, the suggestion advanced in one of petitioner's supplemental briefs — that this court should adopt a rule under which a proposed referendum that obtains a random sampling rate of less than 100 percent of the required number of valid signatures should be considered insufficient to permit this court to advise election officials of the districts that should be used in the event the proposed referendum does qualify (see *post*, fn. 22) — would appear to conflict with the underlying premise of the statutory scheme.

[22] In the present case, for example, we asked the parties during the pendency of this proceeding to file supplemental briefs addressing what significance the signature validity rate from the completed random sampling process would have with regard to the issue of whether a proposed referendum is "likely to qualify" under article XXI, section 3(b)(2).

In response, the parties informed the court of the then-current signature validity rate of the proposed referendum based on the incomplete random sampling process that had been conducted as of the date the supplemental briefing was filed. Although the parties reported the same data — obtained from the Secretary of State's Web site — they disagreed whether the signature validity rate obtained from the random sampling process

(*Footnote continued on following page*)

Thus, for example, if in this case, after we issued an order to show cause, the completed random sampling process had projected less than 95 percent of the required valid signatures, it would have been clear that the proposed referendum had failed to qualify for the ballot and that there was no longer any need for a decision by this court because there was no longer any chance that the Commission-certified state Senate map would be automatically stayed. Under such circumstances, notwithstanding the fact that this court had properly issued an order to show cause, this court would simply have dismissed this writ proceeding as moot.

Furthermore, other relevant factors that develop while such an original writ proceeding is pending in this court also may affect the timing and nature of the relief that

---

(*Footnote continued from previous page*)

is a sufficiently reliable indicator concerning whether a referendum is "likely to qualify" for the ballot.

Petitioner maintained in this regard that "a petition that attains less than a 100 [percent] signature validity rate from the completed random sampling cannot be said to be 'likely' to qualify," whereas "[a] petition that attains more than 100 [percent] is likely to qualify."

The Secretary of State, by contrast, explained that although the random sampling process is adequate to do what that process is designed to do — namely to determine "whether the number of valid signatures on petitions is within a broad range, 95 [percent] to 110 [percent]" — "the sampling technique is not designed to give reliable results at a greater level of precision." The Secretary of State advised the court that "to use the completed sampling process to determine at what point a petition becomes likely to qualify, or to determine whether a 101 [percent] random sample petition is more likely to qualify than a 100 [percent] random sample petition, *is beyond the capacity of the process*." (Italics added.) On this point the Commission, in its own supplemental filing and at oral argument, deferred to and agreed with the Secretary of State.

For the reasons discussed in the text, we conclude that there is no need to determine whether the current available data establishes that it is likely or more probable than not that the proposed referendum will qualify. There is a sufficient probability that the referendum will qualify to make it prudent to decide at this time which districts should be used in the event the proposed referendum does qualify. (See, *post*, at p. 42.)

34

this court will provide. For example, as the briefing and oral argument process progresses, and as this court, through its deliberations, arrives at a consensus concerning the substantive question of what districts should be used in the event the proposed referendum qualifies and stays the Commission-certified districts, the court will continue to assess the relative probability that the referendum will qualify for the ballot and the prudence of resolving the proceeding prior to the referendum's actual qualification.

If this court, after deliberation, concludes that even if the proposed referendum qualifies for the ballot and automatically stays the operative effect of the Commission-certified map, election officials should be directed to use the Commission-certified map on an interim basis because the court has concluded that that map best complies with the constitutionally mandated criteria embodied in the federal and state Constitutions (a scenario, as we discuss later in this opinion, that reflects this court's decisionmaking process in this case), this court could also reasonably conclude that it should issue its decision as early as possible so as to eliminate the uncertainty that inevitably arises from the ongoing signature verification process and the pendency of the writ proceeding in this court. In such a case, when this court has concluded that the Commission-certified map should be used, so long as there remains a substantial possibility that the referendum will qualify for the ballot it would not be necessary for the court to decide whether it is more probable than not that the proposed referendum will qualify. Even if, after the court issues its opinion, the referendum ultimately does not qualify for the ballot and the Commission-certified map is not stayed, issuance of the court's decision — approving the Commission's map — could have no adverse effect upon the Commission-certified map.

By contrast, based on the Commission's processes and the Secretary of State's statutory responsibilities, different considerations may come into play when this court, after briefing, oral argument, and deliberation, concludes that a map other than the Commission-certified map should be used in the interim elections in the event the

35

proposed referendum qualifies for the ballot. Because of the possibility that the issuance of a court decision favoring an alternative map over the Commission-certified map might — in the event the referendum does not qualify — unnecessarily cast a cloud over the legitimacy of that Commission-certified map for the ensuing decade, this court may determine that it is prudent to consider just how likely it is that the proposed referendum will not qualify for the ballot. In determining whether it is prudent to issue its decision *in advance* of the proposed referendum's qualification notwithstanding this potential adverse consequence (and if so, how far in advance), this court would undoubtedly take into account the particular reasons underlying its analysis and determination that an alternative map is more consistent with the constitutionally based criteria than the Commission-certified map, and then decide if and when to issue its opinion based in part on such considerations.

As the foregoing examples illustrate, under this court's traditional California Constitution, article VI, section 10 authority over original writ proceedings, this court properly retains broad discretion to take into account all such considerations as well as any other relevant factor in deciding what relief is appropriate in such a proceeding and when it should be ordered. Because of the variety of circumstances that may be presented in the future, and the impossibility of predicting the nature of the controversies that may arise in this context, we conclude that it would not be wise or appropriate to establish a fixed and inflexible rule or standard that would restrict this court's discretion to take appropriate action in light of all the circumstances that may be presented in a particular case. Thus, we reject any suggestion that this court may determine which districts are to be used for interim elections in the event a proposed referendum ultimately qualifies for the ballot *only* if, at the time the court issues its decision, the available data demonstrates that the referendum is "likely to qualify" for the ballot.

In their briefs, the Secretary of State and the Commission do not deny that under the general provisions of article VI, section 10 of the California Constitution regarding

36

original writs of mandate, and the discretion courts may generally exercise under the ripeness doctrine, this court ordinarily would have authority to issue an order to show cause in this setting and to provide appropriate relief in light of all of the circumstances of the case, even if petitioner fails to demonstrate that it is more probable than not that the proposed referendum measure will qualify for the ballot.  The Secretary of State and the Commission maintain, however, that the specific provision of article XXI, section 3(b)(2) authorizing "[a]ny registered voter [. . . to] file a petition for a writ of mandate or writ of prohibition to seek relief where a certified final map is subject to a referendum measure that is likely to qualify and stay the timely implementation of the map" should be interpreted to limit this court's authority to issue an order to show cause and grant relief in an original writ proceeding in this setting to instances in which a petitioner establishes that the proposed referendum measure is "likely to qualify" for the ballot.  (As discussed above, both the Secretary of State and the Commission maintain that "likely to qualify," as used in article XXI, section 3(b)(2), means "more probable than not.")  In advancing this argument, the briefs rely upon decisions of this court holding that when constitutional provisions conflict, "a recent, specific provision is deemed to carve out an exception to and thereby limit an older, general provision."  (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371; see *Greene v. Marin County Flood & Water Conservation Dist.* (2010) 49 Cal.4th 277, 290.)

The fundamental flaw in this argument lies in its implicit assumption that the sentence within article XXI, section 3(b)(2) upon which the briefs rely was intended, and may reasonably be interpreted, to impose a *limitation* on the circumstances under which this court is authorized to issue an order to show cause or to provide relief in this setting. In our view, it is evident — both from the language of article XXI, section 3(b)(2) itself and from the judicial background against which the provision was drafted (see *Assembly*

37

*v. Deukmejian, supra,* 30 Cal.3d 638)[23] — that this section was intended *to expand*, rather than to limit, the ability of referendum sponsors or supporters to institute an original writ proceeding in this court by explicitly providing that when a proposed referendum is "likely to qualify" for the ballot, any registered voter has *the right* to file such a petition in this court before the Secretary of State formally certifies that the referendum has qualified for placement on the ballot.  The language of article XXI, section 3(b)(2) does not purport to limit this court's jurisdiction or its ability to determine, at a time prior to when the referendum is "likely to qualify," that a case falling within its jurisdiction is ripe for adjudication, and nothing in the ballot pamphlet related to this initiative measure indicates an intention to limit this court's broad article VI, section 10 authority in such a fashion.  Indeed, it would clearly defeat, rather than further, the purpose of article XXI, section 3(b)(2) to interpret the section as limiting this court's authority to entertain a writ petition at an earlier time when an earlier commencement of the action may be necessary, as a practical matter, to enable the court to provide the relief sought in the petition should such relief be found appropriate.  Accordingly, we reject the argument that article XXI, section 3(b)(2) should be interpreted to limit this court's traditional authority under California Constitution, article VI, section 10 in the manner suggested by the Secretary of State and the Commission.

---

[23]    In *Assembly v. Deukmejian*, *supra*, 30 Cal.3d 638, the referendum proponents gathered an extraordinary large number of signatures (well over two times the number of required valid signatures — see *id.*, at p. 682 (dis. opn. of Richardson, J.)) in an exceptionally short period of time (see *post,* fn. 29), and thus may have been able to demonstrate even before the petitions were filed with election officials that it was more probable than not that the referendum would qualify for the ballot.  The drafters of the relevant sentence of article XXI, section 3(b)(2) apparently wanted to make it clear that in such circumstances any registered voter would have the right to file an action for writ relief in this court even though the proposed referendum may not yet have formally qualified for the ballot.

Our determination in this regard does not render the pertinent sentence of article XXI, section 3(b)(2) meaningless or "surplusage." In the absence of article XXI, section 3(b)(2), the ripeness of any petition seeking an original writ of mandate that is filed prior to the qualification of a proposed referendum would be a question for this court's discretionary authority over original writs of mandate under article VI, section 10. Under article XXI, section 3(b)(2), however, when a petitioner is able to show that a proposed referendum is likely to qualify for placement on the ballot, the petition is, *as a matter of law*, sufficiently ripe to permit the petition to be entertained.[24] Thus, by virtue of article XXI, section 3(b)(2), when it is shown that a proposed referendum is likely to qualify, this court may not properly deny the petition for lack of ripeness. By contrast, a petition that is filed *prior* to the time that it can be determined that the proposed referendum is likely to qualify is unaffected by article XXI, section 3(b)(2) and continues to be evaluated by this court under all the considerations ordinarily taken into account under the ripeness doctrine. Accordingly, our conclusion does not render article XXI, section 3(b)(2) surplusage.[25]

---

[24] When a petition is properly filed under article XXI, section 3(b)(2), this court is required to give priority to ruling on the petition. (See art. XXI, § 3(b)(3).) Of course, in any case in which this court issues an order to show cause in an original writ proceeding because of the importance of the issue presented and the need for a prompt decision, this court naturally gives priority to the proceeding in order to provide an expeditious ruling. The present proceeding is an apt example.

[25] Relying upon the "likely to qualify" language in article XXI, section 3(b)(2), the concurring opinion proposes that the court adopt "as a general rule — indeed a presumption — that where a petitioner has not shown that a referendum is likely to qualify, the court should not decide the merits of the mandate petition." (Conc. opn., *post*, at p. 9.) Because the concurring opinion also concludes that the "likely to qualify" language is properly interpreted to mean "more likely than not" (conc. opn., *post*, at p. 11), under the concurring opinion's approach this court, as a general rule, would not decide which map should be used for interim elections if a proposed referendum qualifies for the ballot unless a petitioner has shown that it is more probable than not that the proposed referendum will qualify. Thus, in the absence of such a showing, this court

(*Footnote continued on following page*)

(*Footnote continued from previous page*)

would often be unable to provide timely guidance to election officials, leaving them without sufficient time to implement this court's eventual ruling should the referendum ultimately qualify for the ballot.

For a number of reasons, we believe that the concurring opinion's approach is untenable.

First, as we have explained above (*ante,* pp. 37-39), the "likely to qualify" language in article XXI, section 3(b)(2) was not intended, and may not reasonably be interpreted, to limit this court's authority under article VI, section 10 of the California Constitution to issue an order to show cause or to decide the merits in an original mandate proceeding at a point in time earlier than when a referendum is likely to qualify for the ballot. The concurring opinion fails to identify anything in the language of the provision or in the ballot materials accompanying the initiative measure that added this language to the California Constitution indicating that the provision was intended to have this type of limiting effect on this court's authority. Under these circumstances, article XXI, section 3(b)(2) provides no support for the concurring opinion's conclusion that that provision's "likely to qualify" language constitutes the appropriate standard against which this court's discretion to grant relief under article VI, section 10 should be measured or limited.

Second, although the concurring opinion maintains that the "likely to qualify" standard should be adopted as the general standard for determining when this court will "decide the merits" in such a mandate proceeding, the "likely to qualify" language of article XXI, section 3(b)(2), by its terms, is not directed to the time when the court *may or should decide the merits* of the mandate petition, but rather to the time when a registered voter *may file* such a petition in this court. ("Any registered voter . . . *may . . . file a petition for writ of mandate . . .* to seek relief *where a certified final map is subject to a referendum that is likely to qualify* and stay the timely implementation of the map." (Italics added.)) Although the concurring opinion contests this point, and argues that "the 'likely to qualify' language in section 3(b)(2) is better read as specifying when relief is available and may be granted by this court" (conc. opn., *post*, at p. 9), in our view a plain reading of the constitutional language, as well as the purpose of the provision, belie the concurring opinion's contrary interpretation.

Third, because the concurring opinion ultimately concludes that "we need not apply the 'likely to qualify' standard in this case because of our ultimate disposition" (conc. opn., *post*, at p. 14) — that is, because of the court's determination that the Commission-certified state Senate map should be used if the referendum qualifies for the ballot (see conc. opn., *post*, p. 3) — the opinion makes clear that its proposed likely-to-qualify "general rule" is not intended to apply in all cases but only "in circumstances where [the court] finds or contemplates finding that an alternative to the Commission

(*Footnote continued on following page*)

40

In sum, for the reasons discussed above, we conclude that, under California Constitution, article VI, section 10, this court is authorized to issue an order to show cause and decide which districts should be used in the event a proposed referendum directed at a Commission-certified redistricting map qualifies for the ballot, even in the absence of a showing that the proposed referendum is likely to qualify for the ballot.

Finally, applying the general considerations of the ripeness doctrine to the facts of this case, we conclude that petitioner's claim was sufficiently ripe to support this court's issuance of the order to show cause on December 9, 2011, and that it continues to be appropriate for this court to determine which state Senate districts should be used in the interim elections in the event the proposed referendum qualifies for the ballot.

First, as discussed above, at the time the petition was filed on December 2, 2011, the undisputed facts established that there was a substantial possibility that the proposed referendum would ultimately qualify for the ballot, but that the determination whether or

---

(*Footnote continued from previous page*)

map should be the interim map." (Conc. opn., *post*, p. 4.)  In advocating the adoption of a likely-to-qualify rule that applies only in such limited circumstances, the concurring opinion again departs substantially from the language of article XXI, section 3(b)(2), which draws no such distinction.  The concurrence's apparent response to this point — namely, that this court is not granting "relief" when, as in this case, it issues a writ of mandate directing election officials, in the event the Commission-certified map is stayed by qualification of the referendum, to use a specified map other than a map sought by petitioner (see conc. opn., *post*, at p. 10, fn. 1) — is totally without merit; this court is clearly granting relief when it directs which map is to be used in the event of a stay, whether or not the particular outcome ordered by the court is the relief petitioner is seeking.

In sum, we conclude that article XXI, section 3(b)(2) does not support the concurring opinion's approach.  For the reasons fully set forth in the text (*ante*, pp. 23-39), this court's authority either to issue an order to show cause or to decide what districts should be used in the event a proposed referendum qualifies for the ballot is not limited to circumstances in which the proposed referendum is "likely to qualify" for the ballot.

41

not the referendum would qualify might not be made until early March 2012, when it would, as a practical matter, be impossible to implement a decision of this court requiring the use of state Senate district maps other than those certified by the Commission. Under these circumstances, we conclude that the ripeness doctrine was satisfied and that this court had authority on December 9, 2011, to issue an order to show cause in this original writ proceeding.

Second, the relevant factors that have developed while this matter was pending in this court do not alter our conclusion that it is appropriate to determine in this proceeding what state Senate districts should be used in the event the proposed referendum qualifies for the ballot and stays the operative effect of the Commission-certified state Senate map. During the pendency of this proceeding, the random sampling verification process was completed, resulting in a determination by the Secretary of State on January 10, 2012, that the referendum petition had a signature validity rate projecting a total number of valid signatures between 95 and 110 percent of the required number of valid signatures. As a consequence, the Secretary of State has directed local election officials to conduct a full count of all submitted signatures, a process that the Secretary of State indicates will be completed by those officials no later than February 24, 2012. According to the Secretary of State's representations, however, if this court were to wait until it is finally determined whether the proposed referendum has actually qualified for the ballot, it would be too late to permit this court's decision to be implemented if the court were to determine that a map other than the Commission-certified map should be used for the June and November 2012 elections. Given these circumstances, we conclude that, even though the proposed referendum has not yet qualified for the ballot, it is appropriate for this court to determine at this time which state Senate district map should be used for the 2012 state Senate primary and general elections in the event the referendum does qualify for the ballot and automatically stays the effect of the districts certified by the Commission.

42

Accordingly, we now turn to that question.

IV. *If the proposed referendum qualifies, triggering a stay*
*of the Commission's certified map, under which Senate*
*district map should the 2012 elections proceed?*

A. *Relevant case law*

Petitioner emphasizes the interest that referendum proponents and petition signers have in insisting on an "up or down" referendum vote by the statewide electorate *before* the subject of that measure becomes effective. She acknowledges that 30 years ago in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, this court held, by a four-to-three vote, that redistricting maps that had been enacted by the Legislature and approved by the Governor, but stayed by the qualification of a referendum challenging those maps, should be used as an interim measure pending the electorate's vote on that referendum. Petitioner asserts we should not follow that course here, but should instead establish new interim state Senate district boundaries by either (1) ordering use of the expired state Senate map that the Legislature created in 2001 based on the 2000 census — a remedy similar to the one adopted 40 years ago in *Legislature v. Reinecke, supra,* 6 Cal.3d 595 — or (2) ordering use of one of two alternative state Senate redistricting maps (other than the Commission-certified map) that petitioner has proposed. Indeed, petitioner suggests that the amendments made by Propositions 11 and 20 to article XXI of the California Constitution "vitiate" the main holding of *Assembly v. Deukmejian* with respect to the permissibility of using a stayed map. In order to put petitioner's argument into context, we more fully describe the relevant past decisions of this court to which petitioner refers.

In *Legislature v. Reinecke, supra,* 6 Cal.3d 595, a Republican Governor vetoed new state Senate, state Assembly, and congressional districts that had been passed by the Democratic-controlled Legislature after the 1970 census, leaving in place only the old voting districts that had been based upon the 1960 census. When the petition in *Reinecke* was filed, this court did not have sufficient time to appoint special masters and establish

43

court-approved districts for use in the upcoming 1972 elections. Under those circumstances, this court unanimously concluded that the new Legislature-passed state Senate and Assembly districts that had been vetoed by the Governor should not be used on an interim basis for the 1972 elections, and held instead that the old legislative districts, which had been based on the prior census, should be used for the 1972 elections, even though, due to population shifts, the old districts did not comply with the "one person, one vote" principle embodied in the equal protection clause of the Fourteenth Amendment. (*Legislature v. Reinecke, supra,* at pp. 601-602.) The court in *Reinecke* expressed the view that under the circumstances presented, "it will be far less destructive of the integrity of the electoral process to allow the existing legislative districts, imperfect as they may be, to survive for an additional two years than for this court to accept, even temporarily, plans that are at best truncated products of the legislative process." (*Id*., at p. 602.)[26] With respect to congressional districts, however, the court held that the vetoed map should be used, on an interim basis, in the upcoming elections.[27]

---

[26] Thereafter, following the failure of the Legislature and Governor to agree on new district lines in 1973, we appointed three special masters to recommend to the court new district lines for the succeeding elections in 1974 through 1980, and we eventually accepted and adopted those recommendations with minor adjustments. (*Legislature v. Reinecke, supra,* 10 Cal.3d 396.)

[27] The court explained: "There are . . . compelling considerations that impel us to adopt as a temporary court plan, for the 1972 elections only, the bill passed by the Legislature to reapportion the congressional districts. (Assembly Bill No. 16, 1971 First Extraordinary Session.) Unlike the numbers of assemblymen and state senators, which remain unchanged, the number of representatives in the United States House of Representatives to which California is entitled increased following the 1970 census from 38 to 43. Accordingly, unless congressional districts are reapportioned, the offices of five representatives will either have to be left unfilled or filled by statewide elections. We cannot accept either alternative, for Congress has expressly provided that California shall elect 43 representatives from 43 single member districts. We need only add that we fully agree with the congressional mandate. It would be wholly unacceptable to avoid statewide congressional elections by depriving the state of the representation of five

(*Footnote continued on following page*)

44

Ten years later, in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638*,* the three

redistricting statutes at issue in that case (again, covering the state's Senate, Assembly,

and congressional districts) had been passed by a Democratic-controlled Legislature and

signed by a Democratic Governor in mid-September 1981.  A referendum signature drive

by the California Republican Party began the next day, challenging all three maps.

Shortly thereafter, legislators who supported the legislative reapportionment statutes and

who opposed the referendum filed a writ petition in this court, challenging the

Republican-sponsored referendum on various procedural grounds.[28]

Although petition signatures were gathered and submitted to election officials very

quickly and the Secretary of State was able to determine expeditiously that the

referendum had sufficient valid signatures to qualify for placement on the statewide

ballot,[29] in light of the pending writ challenge to the referendum the Secretary of State

(*Footnote continued from previous page*)

congressmen to which it is entitled, but to conduct statewide elections to fill five congressional seats in a state of California's geographical size and large population would not only tremendously increase the burdens and expenses of effective campaigning but, by increasing the choices confronting the electorate from the candidates for one to the candidates for six congressional seats, would seriously impede the casting of informed ballots." (*Legislature v. Reinecke, supra,* 6 Cal.3d at pp. 602-603, fn. omitted.)

[28]     Three issues ripe for preelection review were directly presented:  (1)  Because the referendum petitions directed signers to use their "address as registered to vote," rather than their "residence address," as required by the then-existing Elections Code, were the petitions defective?  (2)  If defective, should the petitions be allowed to qualify for placement of the referendum before the voters?  (3)  May the referendum process be used to challenge reapportionment statutes?  (See *Assembly v. Deukmejian*, *supra*, 30 Cal.3d at p. 643.)  A fourth issue subsequently arose after the referendum qualified and approximately six weeks before the court filed its opinion:  In light of the intervening qualification of the referendum and the consequent automatic stay of the challenged maps, under what maps should the upcoming election be conducted?  (*Id*., at p. 644.)

[29]     Within only 60 days — 30 days fewer than the 90 days authorized for signature gathering — the referendum proponents submitted their completed signature lists to the

(*Footnote continued on following page*)

announced that she had refrained from directing county clerks to place the referendum on the June primary ballot, pending this court's resolution of the writ challenge to the referendum. The Secretary of State also directed that in the interim, county election officials should proceed on a dual track, preparing to use *either* the newly adopted maps *or* the old maps from 1973 (see *ante*, fn. 26) for the June 1982 election.

This court in *Assembly v. Deukmejian* thus faced a timing problem: the June 1982 primary elections were only a few months away, and election officials needed lead time to prepare ballots. In order to do so, they needed to know the district boundaries. The prior boundaries had become outdated and unconstitutional — because of population shifts, they violated "one person, one vote" requirements. The new boundaries, however, had been stayed by operation of law by the "duly qualified" referendum. (*Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 654-657.)

As already noted, ultimately, in a four-to-three decision, this court decided that the new boundaries should be used as an interim measure for the June 1982 primary election and for the subsequent November 1982 general election. The majority concluded that use

---

(*Footnote continued from previous page*)

Secretary of State. Approximately 30 days later, after reviewing the signatures, the Secretary of State announced that the referendum was duly qualified for placement before the voters on the statewide ballot. (*Assembly v. Deukmejian, supra,* 30 Cal.3d at p. 645.) Prior statutes in place at the time of *Assembly v. Deukmejian* provided shorter time lines for the required signature verification at each stage of that process. (Compare current Elec. Code, §§ 9030 & 9031 [allowing county election officials eight business days for counting of raw signatures, 30 business days for random sampling of 3 percent of raw signatures, and 30 business days for verifying all signatures by a full count] with former Elec. Code, §§ 3520 & 3521 (as amended by Stats. 1980, ch. 1287, §§ 11.3 & 11.4, pp. 4358-4360) [allowing county election officials five business days for raw counting, 15 calendar days for random sampling of 5 percent of raw signatures, and 30 calendar days for verifying all signatures by a full count].) The longer timing schedules of the current statutes, combined with the mid-August deadline for certification by the Commission, exacerbate the time crunch we face now.

of the new, albeit challenged maps, which were based on then-current 1980 census data, "more nearly comports with the requirements of the federal and state equal protection clauses and is least disruptive of the electoral process" in view of the limited options and time constraints. (*Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 665-666.) The court also reasoned that permitting the voice of 5 percent of the electorate who had signed the referendum petition "to delay implementation of a constitutionally required reapportionment plan for two to four years" would "perpetrate a potentially grave injustice on the majority of the people of this state" (*id*., at p. 670): "Although the Constitution of our state grants the power to initiate a referendum to 5 percent of the voters, it does *not* require that the effect of that referendum be articulated in a manner that does such serious injury to conflicting and equally compelling constitutional mandates." (*Ibid.*)

The three dissenting justices in *Assembly v. Deukmejian* argued that although it would be proper to apply the new boundaries with respect to congressional elections (because the number of California seats had increased by two, and there would be no valid way to elect the new number of congresspersons without using the new boundaries), the court should abide by its 1972 decision in *Legislature v. Reinecke,* 6 Cal.3d 595, and use the decade-old boundaries for state Senate and Assembly elections despite the federal constitutional flaws concerning those old boundaries. (*Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 679-694.) Justice Richardson, speaking also for Justices Mosk and Kaus, argued that the majority's decision to employ the stayed map "can only be perceived as an official alignment of the court with one side in a partisan dispute as to which we should remain scrupulously neutral." (*Id*., at p. 680.) Justice Mosk, writing separately, deplored the majority's having become "entangled in the 'political thicket' by ignoring their obligation of neutrality on a partisan issue, a neutrality that can be

47

observed only by maintenance of the status quo in legislative districting until the people speak [on the referendum] at the forthcoming election." (*Id*., at p. 693.)[30]

Quoting from the dissenting opinions in *Assembly v. Deukmejian*, *supra*, 30 Cal.3d at pages 679 and 693, petitioner asserts that the court faces now, and should avoid, a similar "political thicket." She argues that "the political situation [today] is analogous to 1981. Republicans have sponsored and funded the [proposed] referendum against the Commission's Senate map plan." She alludes to speculation that "the Commission may have 'delivered a two thirds majority in the Senate' to Democrats," and states that "Republicans have been dissatisfied with the Commission's Senate lines for these reasons."[31] Further, petitioner relies upon the majority opinion's conclusion in *Legislature v. Reinecke*, *supra*, 6 Cal.3d at page 602, that, on the facts there presented, "it will be far less destructive of the integrity of the electoral process to allow the existing legislative districts, imperfect as they may be, to survive for an additional two years than for this court to accept, even temporarily, plans that are at best *truncated products* of the legislative process." (Italics added.) Petitioner thus argues that the "Commission's

---

[30]  In June 1982, the people, voting by referendum, rejected the Legislature's redistricting map. (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 667.) Thereafter, "Democratic legislators rushed to redraw the lines, passing a compromise plan before lame duck Democratic Gov. Jerry Brown had left office and his Republican successor George Deukmejian could be sworn in. The plan was generous enough to Republicans to garner a two-thirds vote in each house, allowing it to go into effect swiftly and avoid another referendum [citation]. Those lines stayed in place for the remainder of the decade." (Kogan & McGhee, *Redistricting California: An Evaluation of the Citizens Commission Final Plans*, 4 California Journal of Politics and Policy ___ (forthcoming Jan. 2012; available via Google Scholar at <http://polisci2.ucsd.edu/vkogan/research/redistricting.pdf>, p. 4 [as of Jan. 27, 2012].)

[31]  Petitioner elaborates on these statements in her reply brief. She asserts: "Media commentators all have noted that the Commission's maps favored Democrats. Many signers, alarmed about the state of California's economy, may have signed to better prevent the prospect of a safe, two-thirds majority in the State Senate to raise their taxes."

48

Senate map is now part of a truncated process [in that] a [proposed] referendum has been filed against it." She asserts that, in the event the referendum petition eventually is determined to be supported by an adequate number of verified signatures, we should order that the June and November 2012 state Senate elections proceed with alternative interim maps other than the Commission's certified map that is the subject of the proposed referendum.

For two reasons, we do not find persuasive petitioner's claim that the circumstances in this case are comparable to the circumstances that were presented in *Legislature v. Reinecke*, *supra*, 6 Cal.3d 595, and *Assembly v. Deukmejian*, *supra*, 30 Cal.3d 638.

First, the redistricting process here has not been "truncated" as it was by the Governor's veto in *Legislature v. Reinecke*. The constitutionally mandated procedure has been completed by the Commission's certification of a Senate map. If the referendum on that map qualifies for the ballot, the effectiveness of the Commission's product will be stayed pending the referendum's outcome, but qualification itself does not terminate or reverse the Commission's redistricting process. As with the stayed product of legislative redistricting in *Assembly v. Deukmejian*, *supra*, 30 Cal.3d at page 671, the certified Senate map here has "never been rejected by any government entity" and the redistricting process thus "has been lengthened but not terminated."

Second, petitioner overlooks a crucial distinction between the redistricting process as it existed at the time of those decisions and the redistricting process that is in effect in California today. At those earlier times, voting districts were created by state legislators and it was frequently charged that redistricting maps were commonly drawn on a partisan basis to give maximum political advantage to the political party that enjoyed majority control of the legislative branch. Given the difference between the origins of the stayed maps at issue in the former cases and the Commission's state Senate map, any criticism

49

of *Assembly v. Deukmejian*, as improperly intruding into the "political thicket" would simply not apply to the present case.

As we have explained *ante*, the redistricting process in California has been completely changed from the earlier process. Under California Constitution, article XXI, redistricting is now performed by a Citizens Redistricting Commission, whose membership and procedural requirements are carefully designed to ensure that redistricting is undertaken on a nonpartisan basis. When a redistricting map adopted by such a nonpartisan entity is challenged by a proposed referendum measure sponsored by one political party, we believe it is unrealistic to maintain that a court should be viewed as improperly intruding into the "political thicket" if it determines, after reviewing the pros and cons of all viable alternative maps in relation to the constitutional scheme and criteria, that the map devised by the nonpartisan Commission is the most appropriate one to be used in an interim election. We also question petitioner's suggestion that a court should be viewed as properly avoiding the same political thicket if it were to decide that the most appropriate map to be used in the interim election is one proposed by the proponent of a referendum sponsored by one political party.**32**

---

**32** In addition, we note a further significant distinction between this case and *Assembly v. Deukmejian, supra,* 30 Cal.3d 638. Use of the Commission's districts for the 2012 elections would not carry with it another problem that was inherent in the situation this court faced in *Assembly v. Deukmejian*. The use of the Legislature's redistricting maps for the interim elections in that case had the effect of giving an advantage to that party not only to elect legislators in the interim year elections, but also permitted the legislators thus elected from those districts to adopt *new* redistricting maps that would be needed if the first legislative districts were rejected by the voters in the referendum election (as ultimately occurred — see *ante*, fn. 30). Thus, the decision to use the legislatively devised districts in *Assembly v. Deukmejian* had a direct effect upon the districts that were in use in California for the entire decade, and did not affect only the interim year's elections.

In the present case, by contrast, if the proposed referendum qualifies for the ballot and the voters reject the Commission's districts at the upcoming November 2012

(*Footnote continued on following page*)

Furthermore, contrary to petitioner's assertion, we do not believe that respect for the constitutionally based referendum power requires that a court, faced with the question of which voting district map should be used for an interim election, must exclude from its consideration a redistricting map that has been stayed by qualification of a referendum. (See *Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 658-660.) A referendum's qualification for the ballot is given full respect by recognizing that the qualification stays the operative effect of the redistricting map that otherwise would lawfully govern the upcoming election in the absence of the referendum, and requires this court to determine what districts to use in the interim elections. The stay of the challenged redistricting map, however, does not necessarily or logically restrict this court's authority and responsibility to consider and evaluate on the merits *all* of the potential redistricting maps that could be used in the upcoming interim elections to determine which map the court should direct elections officials to implement for those elections.[33]

---

(*Footnote continued from previous page*)

election, the new districts would not be drawn by legislators elected from the very districts that the voters have rejected. Rather, pursuant to California Constitution, article XXI, section 2, subdivision (j), new districts would be established by this court with the aid of special masters. For this reason, interim use of the Commission's state Senate map for the June and November 2012 elections would not produce the same type of long-term adverse effect that the use of the partisan legislatively drawn districts had in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638.

[33] As we have seen, even in *Legislature v. Reinecke*, *supra*, 6 Cal.3d 595, this court, while declining to adopt on an interim basis the new state Senate and Assembly districts that had been passed by the Legislature but vetoed by the Governor, recognized that it possessed the authority to adopt on an interim basis the new congressional districts that had been passed by the Legislature, even though the Governor had also vetoed the new congressional redistricting map. In like manner, the fact that qualification of a referendum operates to stay the effect of a Commission-certified map does not limit this court's authority to consider the merits of that map along with other alternatives in determining what districts should be utilized at the elections that are to be held before the referendum is voted upon.

(*Footnote continued on following page*)

In sum, in light of the fundamental change in the redistricting process in California, we conclude that it would not be appropriate for this court to, in effect, adopt a presumption against the use of a Commission-certified map as an interim measure in the event the Commission-certified map is stayed by the qualification of a referendum petition. Instead, we believe it is most appropriate to fairly evaluate the pros and cons of all the potential alternative redistricting maps in relation to the constitutional scheme and criteria in order to determine which should be used in the upcoming elections if the proposed referendum qualifies for the ballot.

## B. *Potential interim maps*

In so reviewing the pros and cons of each of the redistricting maps that have been proposed for use on an interim basis in the event the proposed referendum qualifies for the ballot, we begin with the three alternative maps proposed by petitioner, and then consider the Commission-certified map.

---

(*Footnote continued from previous page*)

Indeed, petitioner's alternative proposals regarding the relief that she requests this court provide implicitly acknowledge that the qualification of the proposed referendum and resultant stay of the Commission-certified state Senate district map would not deprive this court of the authority to adopt interim state Senate districts that differ from those embodied in the preexisting 2001 redistricting map. In fact, under one of petitioner's proposed alternatives — the "nesting" map described below — this court, in fashioning Senate districts for use in the interim elections, would utilize without change the new state Assembly districts that were created and certified by the Commission and thus adopt a map that includes at least several state Senate districts that precisely mirror the Senate districts contained in the Commission-certified map.

1. *Use of the "old map" adopted by the Legislature in 2001 based on the 2000 census*

The first alternative proposed by petitioner is to follow the approach of *Legislature v. Reinecke, supra*, 6 Cal.3d 595, and use the outdated state Senate district map that was formulated by the Legislature in 2001, based on the 2000 census.

The most obvious problem with the 2001 map concerns the principle of "one person, one vote," under both the federal equal protection clause (as construed in, e.g., *Reynolds v. Sims* (1964) 377 U.S. 533) and under California Constitution, article XXI, section 2, subdivision (d)(1). As noted earlier, article XXI, section 2, subdivision (d)(1) lists as the first order of priority for redistricting that "[d]istricts shall comply with the United States Constitution. Congressional districts shall achieve population equality as nearly as is practicable, and Senatorial, Assembly, and State Board of Equalization districts shall have *reasonably equal population with other districts for the same office, except where deviation is required to comply with the federal Voting Rights Act or allowable by law*." (Italics added.)

The United States Supreme Court has explained that with regard to *legislatively enacted* reapportionment, " '[m]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10 [percent] falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State.' " (*Voinovich v. Quilter* (1993) 507 U.S. 146, 161, quoting *Brown v. Thomson* (1983) 462 U.S. 835, 842-843.) Although the high court has not identified an upper limit of deviation that simply cannot be justified, one of the court's decisions suggested that the outer limits might be reached if the deviation exceeded 16.4 percent. (*Mahan v. Howell* (1973) 410 U.S. 315,

53

329 [stating that a 16.4 percent deviation "may well approach tolerable limits"]; see also *Brown v. Thomson*, *supra*, at pp. 849-850 (conc. opn. of O'Connor, J.) [noting the *Mahan* court's statement that a 16.4 percent deviation may approach the maximum that is permissible]; *Daly v. Hunt* (4th Cir. 1996) 93 F.3d 1212, 1218 [same].)[34]

*Court-ordered* reapportionment, contrasted with legislatively enacted reapportionment, is subject to even stricter standards, and " 'must ordinarily achieve the goal of population equality with little more than *de minimis* variation.' " (*Connor v. Finch* (1977) 431 U.S. 407, 417; see also *Perry v. Perez* (2012) 565 U.S. ___, ___ & fn. 2 [2012 WL 162610, 2012 U.S. Lexis 908] [de minimus standard applies to court-drawn maps responding to challenged portions of state maps]; *Abrams v. Johnson* (1997) 521 U.S. 74, 98.) As explained *post*, the disparities would not be de minimis if we were to order interim use of the Legislature's 2001 map.

Petitioner observes that some of the deviations considered by this court in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, were higher than the deviations that would be created now, if this court were to order interim use of the Legislature's 2001 map that was crafted in light of the 2000 census.[35] According to petitioner: "In the case

---

**34** Petitioner, in her reply brief, cites *Brown v. Thomson*, *supra*, 462 U.S. 835, as an example of a case in which the high court accepted a much larger deviation. (See *id.*, at pp. 839, 846 (lead opn. of Powell, J.) [referring to a 16 percent average deviation and an 89 percent maximum deviation].) In that case, however, the state's overall redistricting was not at issue (*id.* at p. 846); rather, the challenge was limited to a single district that, because of its status as a county, was accorded a representative despite its small size. The limited scope of the decision also was recognized by the two concurring justices (*id.*, at p. 849 (conc. opn. of O'Connor, J.)), and the four dissenting justices agreed that the court's holding was "extraordinarily narrow." (*Id.*, at p. 850 (dis. opn. of Brennan, J.).)

**35** For example, in *Assembly v. Deukmejian,* we observed: "According to figures supplied by real parties, the current population of the old 76th Assembly District (530,643) is 236 percent of the population of the old 16th Assembly District (224,488). The vote of a resident of the former 16th District would, therefore, be worth more than twice that of a resident of the former 76th District. Compared to the current ideal district

(*Footnote continued on following page*)

of the odd-numbered Senate districts that come up for election in 2012, the percent deviation from largest to smallest is 38.7 percent; the [most populous] district, Senate District 37, is over [the ideal population size] by 284,528 people, 30.5 percent, while the [least populous] district, Senate District 21, is under by 76,335, 8.2 percent."[36] Petitioner asserts that "[s]eventeen of the odd numbered districts are within 10 percent of the norm, and eight deviate by less than five percent. Only three deviate by more than 10 percent."[37] Petitioner maintains that "the population deviations are not nearly as great as they were in [1982] when the Court declined to follow its *Reinecke* decision."

---

(*Footnote continued from previous page*)

size, the old 76th District is 79.4 percent greater than the ideal, while the old 16th District is 24.1 percent less than the ideal. The total deviation between the two districts is 103.5 percent.

"Overall, 2 of the old Assembly districts vary by more than 50 percent from the ideal population size of 295,857; 2 vary by 30 to 50 percent from the ideal size; and 48 of the 80 districts vary by 10 to 30 percent from the ideal. Only 28 of the districts are within 10 percent of the ideal district size.

"In the Senate, old Senate District 5 now contains 458,587 people, 22.5 percent less than the ideal number, while old Senate District 38 contains 904,725 people, 52.9 percent more than the ideal. Thus, the vote of a resident of former District 5 would be worth almost twice that of a resident of former District 38. The total deviation between the two districts is 75.4 percent. Real parties' figures show that the population of one old Senate district is more than 50 percent greater than the ideal; another is 41 percent greater than the ideal; 19 vary by 10 to 30 percent from the ideal; and 19 are within 10 percent of the ideal population size." (*Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 666-667.)

[36] In light of our conclusion that this proposed alternative should not be adopted even under petitioner's suggested analysis, we need not and do not determine whether it is appropriate to evaluate population deviations only in the odd-numbered state Senate districts rather than the deviation in all of the Senate districts.

[37] Petitioner concedes that in addition to old Senate District No. 37, which as noted currently is over the ideal population size by 284,528 people, or 30.5 percent, according to petitioner, old Senate District No. 17 currently is over the ideal population size by 166,798 people, or 17.9 percent, and old Senate District No. 5, currently is over the ideal population size by 101,265 people, or 10.9 percent.

55

The Commission asserts that the relevant deviation, as we described it in *Assembly v. Deukmejian, supra,* 30 Cal.3d at page 667, is to be measured "between the largest and smallest districts" — and not from the "ideal" Senate district population.**38**  The Commission argues that the calculations of petitioner's consultant (submitted to us in the declarations of Dr. T. Anthony Quinn, in support of the petition) improperly "ignore the relevant population deviation *among* the 2001 districts from the 'ideal' population of a Senate district," and that correctly understood, "19 out of 20 of the odd-numbered Senate districts deviate by more than 16.4 [percent] and are thus patently unconstitutional." Moreover, the Commission asserts that "even using [petitioner's] incorrect frame of reference (deviation from the 'ideal,' rather than comparison to other 2001 districts), [petitioner] concedes that three districts are unconstitutional."

In this regard, and as the Commission observed in its preliminary opposition brief (in which it implicitly accepted for purposes of analysis petitioner's frame of reference — deviation from the "ideal," rather than comparison to other 2001 districts), petitioner's own consultant's summary shows that three 2001 Senate districts, if imposed by this court, would be constitutionally suspect, as deviating excessively from the ideal.  (See *ante*, fn. 37.)  The Commission asserts in that opposition brief that under petitioner's own analysis, Senate Districts Nos. 17 and 37 would be "patently unconstitutional — deviating by 17.9 [percent] and 30.5 [percent] respectively."  We conclude that such results would raise serious constitutional questions in light of the court's obligation, in adopting an alternative interim map, to avoid any but de minimis deviations.  (See *Abrams v. Johnson*, *supra*, 521 U.S. at p. 98.)

Petitioner's consultant, Dr. T. Anthony Quinn, in a supplemental declaration filed December 7, 2011, asserts there is a ready fix:  "This situation is easily resolved.  The

---

**38**    Petitioner's reply brief does not respond to this point.

Court could simply order that these three districts be reduced in size so that the districts electing in 2012 are within the 10 percent deviation range. Petitioner would be very happy to suggest to the court areas to be removed from the existing districts and the Secretary of State could instruct the counties to conduct the 2012 election only in the remaining portions."

Petitioner's suggestion that the 2001 lines for three Senate districts could be easily "revised' is highly questionable. As the Commission observes, "[f]or example, 2001 Senate district 37 in Riverside County now has a population of 1,215,876. (MacDonald Decl. Ex. C.) To come within a 10 [percent] deviation of the least populated Senate district (2001 district number 21), district 37 would need to shed 267,764 people. (*Ibid.*) However, the districts immediately to 2001 district 37's north (2001 districts 18 and 31) and to its south (2001 district 40) are also overpopulated. (*Ibid.*) As a result, any 're-drawing' of 2001 districts would require the Court to reconfigure population clusters in the greater Los Angeles area, which would be certain to produce population ripple-effects throughout this densely packed region (if not through the entire state). [Citation to *Legislature v. Reinecke, supra,* 10 Cal.3d at p. 403.] Moreover, re-drawing Los Angeles-area districts would affect . . . Latino districts in Los Angeles [under section 2 of the Voting Rights Act], causing unanticipated effects and likely violating [that act]."[39]

---

[39] Congress enacted section 2 of the Voting Rights Act to combat minority vote dilution. Section 2 prohibits the imposition or application of any "voting qualification," "prerequisite to voting" or "standard, practice, or procedure," which results in the "denial or abridgement of the right of any citizen . . . to vote on account of race or color," or on account of minority language status. (42 U.S.C. § 1973(a).) The test for determining whether an electoral practice results in a denial or abridgment of the right to vote is set forth in subdivision (b) of section 2 of the act. In order to prevail, a plaintiff must be able to demonstrate that, "based on the totality of circumstances, . . . the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial or language minority]," in that members of those protected classes "have less opportunity than other members of the electorate to

(*Footnote continued on following page*)

By comparison, the Commission explained in its Final Report that it "strive[d] for a total population deviation of zero" and "would allow no more than a 2.0 [percent] total deviation except where further deviation would be required to comply with the federal Voting Rights Act or allowable by law." (Final Rep., at pp. 11-12.)[40] The Commission's

___

(*Footnote continued from previous page*)

participate in the political process and to elect representatives of their choice." (42 U.S.C. § 1973(b).) (See generally *Wilson v. Eu*, *supra*, 1 Cal.4th at pp. 744-749 [discussing relevant "section 2" and United States Supreme Court authority]; Final Rep., at pp. 13-16 [same].)

[40] The Commission's Final Report, at page 10, observed that as originally enacted in 1980, article XXI of the California Constitution "mirrored the special masters' standard from the 1970s [see *Legislature v. Reinecke, supra,* 10 Cal.3d 396, 411, which aimed for districts within 1 percent of the ideal and in no event deviating more than 2 percent] and required that 'the population of all districts of a particular type shall be *reasonably equal.*' (*Wilson v. Eu* (1992) 1 Cal.4th 707, 753 . . . , italics added.)" The Final Report continues:

"The Attorney General had interpreted that language 'as incorporating the more restrictive population requirements contained in [*Reinecke*] that the "population of senate and assembly districts should be within 1 percent of the ideal except in unusual circumstances, and in no event should a deviation greater than 2 percent be permitted." ' (*Ibid.*, quoting *Reinecke*, *supra*, 10 Cal.3d at p. 411.) Accordingly, the special masters in the 1990s expressly complied with that stricter deviation limit, while acknowledging that they had selected a maximum deviation that may have been even more stringent than the California Constitution required. (*Wilson*, *supra*, 1 Cal.4th at p. 753.) The California Supreme Court approved the masters' plans without explicitly ruling on the maximum deviation permitted under the California Constitution. (See *id*. at p. 719.)

"Proposition 11 and Proposition 20 amended the population-equality language in California's Constitution to state that 'Senatorial, Assembly, and State Board of Equalization districts shall have *reasonably equal population* with other districts for the same office, *except where deviation is required to comply with federal Voting Rights Act or allowable by law.*' (Cal. Const., art. XXI, § (2), subd. (d)(1), amended by initiative, Gen. Elec. (Nov. [2,] 2010), italics added.)

"No court has interpreted the population-equality language in Propositions 11 or 20. Accordingly, no court has decided whether, or how, the addition of the phrase 'except where deviation is required to comply with the federal Voting Rights Act or allowable by law' to 'reasonably equal population,' may alter the total deviation allowed under the California Constitution." (Final Rep., at p. 10.)

certified Senate map's maximum total deviation between districts is only 1.98 percent. (Final Rep., appen. 3, table 1, Senate Districts.)

Petitioner's proposal to use the Legislature's outdated 2001 map suffers from another substantial problem. As noted *ante* in part II.C., California Constitution, article XXI, section 2, subdivision (d), as amended in 2008 and 2010, sets out six prioritized criteria: compliance with (1) the United States Constitution (the equal protection clause and "one person, one vote" principles) and (2) the federal Voting Rights Act; (3) geographical contiguity; (4) respect for the "geographic integrity of any city, county, city and county, local neighborhood, or local community of interest . . . to the extent possible"; (5) encouraging geographical compactness, to the extent practicable; and (6) "[t]o the extent practicable, and where this does not conflict with the criteria above, each Senate district shall be comprised of two whole, complete, and adjacent Assembly districts . . . ." As observed earlier, some but not all of these six redistricting criteria currently set out in article XXI, section 2, subdivision (d), also were set out as relevant standards for the Legislature's consideration in the prior version of article XXI that was in effect at the time the Legislature created the 2001 old maps based on the 2000 census. But not all of the criteria set out in the recent amendments to article XXI were previously articulated, nor were any of the factors previously expressly prioritized; the Legislature, when crafting the prior maps in 2001, was not required to apply the criteria pursuant to the rank ordering that controls today.[41] Petitioner has made no attempt to

---

[41]   Until amended by Proposition 11 in 2008 and Proposition 20 in 2010, California Constitution, former article XXI, as adopted in 1980, read as follows: "In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in conformance with the following standards:

"(a)  Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district.

(*Footnote continued on following page*)

address in what ways the Legislature's old 2001 Senate map based on the 2000 census comports with these prioritized criteria given population changes during the last decade. We conclude that, insofar as this alternative map is concerned, petitioner has provided us with no basis upon which we can conclude that it respects the constitutionally specified criteria at least as much as any other of the other proposed maps, including the Commission's certified state Senate map.

Finally, in an additional significant respect the 2001 Senate district map appears legally suspect. As discussed *ante*, article XXI, section 2, subdivision (e) provides that "[d]istricts shall not be drawn for the purpose of favoring or discriminating against an incumbent, political candidate, or political party." The Legislature's 2001 redistricting map has been widely perceived as specifically designed to protect incumbent legislators of both major political parties and as serving that purpose well over the decade in which the redistricting map was in effect. (See, e.g., Center for Governmental Studies, Redistricting Reform in California: Proposition 11 on the November 2008 California Ballot (2008) p. 12 [noting that in 2001 the Legislature drew district lines "that favor the re-election of incumbents from both parties" and that "[a]s a result, only one seat has changed parties due to competition, and only one incumbent has lost in the 459 legislative and Congressional general election races held this decade" (fn. omitted)]; Block, *Partisan Reapportionment* (2003) 34 Cal. Journal 21; Plendl, *Are the voters dissed*

---

(*Footnote continued from previous page*)

"(b) The population of all districts of a particular type shall be reasonably equal.
"(c) Every district shall be contiguous.
"(d) Districts of each type shall be numbered consecutively commencing at the northern boundary of the State and ending at the southern boundary.
"(e) The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section."

*by redistricting?* (2002) 33 Cal. Journal 12.)[42]  By contrast, academic observers have concluded that the Commission's maps, including the certified state Senate map, "represent[] an important improvement on the legislature-led redistricting of 2001.  The new district boundaries kept more communities together and created more compact districts while at the same time increasing opportunities for minority representation. . . . [T]hese maps . . . have the potential to modestly increase competition in California elections and the responsiveness of the legislative branch to changing voter preferences." (Kogan & McGhee, *Redistricting California: An Evaluation of the Citizens Commission Final Plans*, *supra,* 4 Cal. Journal of Politics and Policy ___ (forthcoming Jan. 2012; available via Google Scholar at <http://polisci2.ucsd.edu/vkogan/research/ redistricting.pdf>, pp. 32-33 [as of Jan. 27, 2012].)

It was partly in reaction to the Legislature's 2001 maps that the Commission was created and charged with drawing district lines.  (See Voter Information Guide, General Elec. (Nov. 4, 2008) text of Prop. 11, § 2, subd. (b) [noting that "[u]nder current law, California legislators draw their own political districts" and that, as a result, "99 percent of incumbent politicians were reelected in the districts they had drawn for themselves in the recent elections"]; Voter Information Guide, General Elec. (Nov. 2, 2010), Argument in Favor of Prop. 20 [asserting that "in the last redistricting" politicians paid a consultant to draw district boundaries "to guarantee their reelection"].)  In our view, it would contravene the intent of the new redistricting regime of article XXI of the California Constitution if this court were to order the use of old state Senate districts that were perceived as designed for purposes no longer permissible.

---

[42]    See also McGhee, *Redistricting and Legislative Partisanship* (2008) Public Policy Institute of California, p. 1; Quinn, *CA: The Bipartisan Redistricting: How It Happened* (Oct. 2001) vol. 5, No. 8, Cal-Tax Digest <http://www.caltax.org/member/digest /oct2001/10.2001.Quinn-BipartisanRedistricting.08.htm> (as of Jan. 27, 2012).

2. *Petitioner's proposed "nesting" map*

Petitioner's second proposed alternative is to create new state Senate districts by combining two adjacent state Assembly districts, of which there are 80, into single Senate districts, of which there are 40. Petitioner refers to this as her "simple nesting plan."

As noted, California Constitution, article XXI, section 2, subdivision (d) sets forth six prioritized criteria, the last of which is: *"To the extent practicable, and where this does not conflict with the criteria above*, each Senate district shall be comprised of two whole, complete, and adjacent Assembly districts . . . ." (Italics added.)

Petitioner does not explain how her nesting proposal can be reconciled with article XXI's rank ordering of criteria. As the Commission explained in its Final Report, although it attempted to nest Assembly districts in Senate districts "[t]o the extent practicable" and when "not in conflict with the other" higher-prioritized criteria, in practice the Commission, balancing those other criteria, was able to fully achieve the nesting goal in only three of the 40 Senate districts. (See Final Rep., appen. 5.)[43] As the Commission describes in its brief: In order "to minimize city and county splits (a higher-order criteria than nesting), the Commission created certain Senate districts from 'blended' Assembly districts" so as to "avoid repeating city and county splits that were unavoidable at the Assembly level." As the Commission further explains, it "also blended Assembly districts to respect communities of interest 'where more than two Assembly districts had common interests or geographical characteristics that were common to a single Senate district.' " (See Final Rep., at p. 42.)

---

[43] In addition to three districts that achieved 100 percent nesting, three others achieved nesting of at least 99 percent of the district's population. The two least-nested districts achieved that goal with respect to approximately 65 to 66 percent of the district's population. (Final Rep., appen. 5.)

In contrast to the Commission-certified state Senate map, petitioner's nesting proposal would require this court to adopt nesting, the lowest valued criterion, as the controlling criterion, without regard to, and at the expense of, several other higher value criteria.

First, petitioner's nesting proposal appears to conflict with criterion (2) of article XXI, section 2, subdivision (d) — compliance with the federal Voting Rights Act. Under section 5 of that Act,[44] before a state may implement any voting-related change that will affect a "covered jurisdiction," the state must seek either judicial or administrative approval of the change to ensure that it does not have the purpose or effect of denying or

[44]     Section 5 of the Voting Rights Act requires that before certain "covered jurisdictions" may implement any change in a voting qualification, a prerequisite to voting, or a standard, practice, or procedure with respect to voting (a voting-related change), the state must seek judicial or administrative approval of the voting-related change to ensure that it does not have the purpose or effect of denying or abridging the right to vote on account of race, color, or language minority. (42 U.S.C. § 1973c(a).) Section 5 of the Voting Rights Act applies to only four California counties: Kings, Merced, Monterey, and Yuba. (*Wilson v. Eu*, *supra*, 1 Cal.4th at p. 746.) Thus, section 5 applies to statewide changes to California's voting practices and procedures only to the extent that those changes affect these covered counties. (*Lopez v. Monterey County* (1999) 525 U.S. 266, 280-281; see generally *Wilson v. Eu*, *supra*, at pp. 745-746; Final Rep., at pp. 21-23.)

The process of obtaining judicial or administrative approval for a voting-related change that affects a covered county is called "preclearance." A state may seek preclearance either from the Attorney General of the United States (Department of Justice) or from the United States District Court for the District of Columbia, and until a state obtains preclearance for a voting-related change that affects a covered county, the voting-related change is unenforceable. (42 U.S.C. § 1973c(a); see, e.g., *Perry v. Perez, supra,* 565 U.S. ___ [2012 WL 162610, 2012 U.S. Lexis 908].) Because the Commission's four certified maps constitute voting-related changes that will affect the covered counties, on November 15, 2011, the California Attorney General submitted the Commission's maps to the Department of Justice. (The 44-page preclearance submission, along with all other Commission documentation, is available on the Commission's Web site, <http://www.wedrawthelines.ca.gov> [as of Jan. 27, 2012].) On January 17, 2012, the Department of Justice approved use of the maps.

abridging the right to vote on account of race, color, or language minority. (42 U.S.C. § 1973c(a).) As observed *ante*, footnote 44, section 5 of the Voting Rights Act applies to only four California counties: Kings, Merced, Monterey, and Yuba. A redistricting map will have the "effect" of "denying or abridging the right to vote" if it "lead[s] to a retrogression in the position of racial [or language] minorities with respect to their effective exercise of the electoral franchise." (*Beer v. United States* (1976) 425 U.S. 130, 141 (*Beer*); see also *Riley v. Kennedy* (2008) 553 U.S. 406, 412; *Wilson v. Eu*, *supra*, 1 Cal.4th at p. 746.)

"Retrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan. [Citation.] It also necessarily implies that the jurisdiction's existing plan is the benchmark against which the 'effect' of voting changes is measured." (*Reno v. Bossier Parish School Bd.* (1997) 520 U.S. 471, 478.) Accordingly, newly drawn districts that improve or maintain the voting rights of minority groups satisfy section 5. (*Beer*, *supra*, 425 U.S. at p. 141; see also *City of Lockhart v. United States* (1983) 460 U.S. 125, 134 [finding city's map was entitled to preclearance because it did not "increase the degree of discrimination" against the city's Mexican-American population]; *Wilson v. Eu*, *supra*, 1 Cal.4th at p. 746.) By contrast, newly drawn (or in this case proposed alternative) districts that "retrogress" the voting rights of minority groups would violate section 5.

Petitioner's consultant, Dr. T. Anthony Quinn, asserts that under petitioner's nesting proposal, the sole section 5-covered jurisdiction that would be impacted is Monterey County, through petitioner's proposed "nested" Senate Districts Nos. 13 and 15. The Commission asserts that petitioner "fails to address, however, that [these] proposed Senate districts 13 and 15 fall far below the 2001 benchmark levels and thus violate Section 5: [Petitioner's] proposed district 13 [a combination of certified Assembly Districts Nos. 28 and 29], covering north Monterey County, falls from the 2001 benchmark of 26.22 [percent] Latino Voter Age Population ('LVAP') to 17.66

64

[percent] LVAP.  Similarly, [petitioner's] proposed Senate district 15 [a combination of certified Assembly Districts Nos. 27 and 30], reduces the benchmark for South Monterey from 53.48 [percent] LVAP to 51.31 [percent] LVAP."  The Commission asserts that "[n]either result is permissible under Section 5 of the Voting Rights Act."

In a second way, petitioner's nesting proposal would appear to exalt nesting over yet other higher-ranked criteria, set forth in California Constitution, article XXI, section 2, subdivision (d)(4).  That subdivision requires a redistricting map to respect the "geographic integrity of any city, county, city and county, local neighborhood, or local community of interest . . . in a manner that minimizes their division to the extent possible without violating the requirements of any of the preceding subdivisions."  Petitioner's map would result in five more splits of cities and counties compared with the Commission's certified map,[45] and also would split more "local communities of interest." For example, as the Commission observes:  Certified "Senate district 1 was created in part to keep intact the Lake Tahoe basin, in light of overwhelming public support for keeping that community of interest together.  See, e.g., El Dorado County Bd. of Supervisors Resolution No. 82-2011, submitted [to the Commission] June 28, 2011.)[46] Ignoring this public input, [petitioner's] proposed nesting plan splits Lake Tahoe between her proposed districts 1 and 4."[47]

---

[45]     As the Commission observes — and petitioner does not contest — the Commission's certified Senate map splits "20 cities and 11 counties (excluding zero-population splits and cities or counties with populations greater than 931,349, the ideal 2010 [S]enate district population), for reasons explained in the Final Report [at p. 42]. [Petitioner's] nesting map, by contrast, splits 22 cities and 14 counties."

[46]     Like all other matters submitted to the Commission, this resolution is posted on the Commission's Web site, <http://www.wedrawthelines.ca.gov> (as of Jan. 27, 2012).

[47]     In another way, petitioner's nesting proposal, and specifically her proposed state Senate Districts Nos. 1 and 3, appears to violate article XXI, section 2 of the California Constitution.  As noted earlier, subdivision (f) provides that districts "shall be numbered

(*Footnote continued on following page*)

In addition to subordinating higher-ranked constitutional criteria, the Commission argues, the nesting proposal also would increase dramatically the number of "deferred" voters — those voters residing in 2001 districts that who did not vote for a state senator in 2010 and who thus ideally would be placed in new districts that are scheduled to vote for a state senator in 2012 but who are instead placed in districts that would not vote for a state senator until 2014 — and would inevitably "double-defer" some voters.[48] The Commission points out that its own certified maps minimized the number of deferred voters by employing three numbering alternatives. According to the Commission, petitioner's nesting proposal would result in deferrals for at least 4,592,350 voters, an increase of 15.5 percent over the 3,972,984 voters who will be deferred under the Commission's maps.[49]

The Commission contends that petitioner's nesting proposal also raises the specter of "double-deferral" — individual voters who would be deferred in both 2012 *and* 2014

---

(*Footnote continued from previous page*)

consecutively commencing at the northern boundary of the State and ending at the southern boundary." Petitioner's proposed nested state Senate District No. 1 does not touch the state's northern boundary, where petitioner would place her proposed nested state Senate Districts Nos. 2 and 4, and indeed is located south of petitioner's proposed nested state Senate District No. 3, as well.

[48]    The Commission "agrees that some level of voter-deferral is inevitable in any Senate redistricting plan, as voters move between 'odd' and 'even' numbered districts." Nevertheless, the Commission asserts, the number of deferred voters is an important consideration when considering alternative interim plans.

[49]    Based on analysis of the exhibits appended to the declaration of Karin MacDonald, the Commission asserts that petitioner's proposed nested Senate Districts Nos. 33 and 34 "would create more deferrals by their numbering:  [The] proposed [nested] district 34 contains 529,759 residents from a 2001 odd-numbered district and only 398,611 residents from a 2001 even-numbered district.  [The] proposed [nested] district 33, on the other hand, contains 513,062 residents from a 2011 even-numbered district and 421,083 residents from a 2001 odd-numbered district."

66

due to the implementation of another set of maps after the 2012 elections. In this regard, the Commission explains, "[t]he worse-case scenario is not, as Petitioner casually asserts, 'having the right to vote in an extra election,' but rather being denied the right to vote in both the 2012 and 2014 elections. [Citation.] These ill effects would not occur with the Commission's certified Senate districts, yet are virtually guaranteed under [petitioner's] nesting proposal."

Finally, the Commission asserts, the prospect of double-deferral raises other potential problems under section 2 of the Voting Rights Act (see *ante*, fn. 39), because none of petitioner's proposed nested districts with minority voting populations protected by section 2 of that act (according to the Commission, proposed nested state Senate Districts Nos. 24, 30, and 32) would vote for state senators in 2012.[50] The Commission concludes that as a result, under petitioner's nesting proposal, "the brunt of double-deferral will fall on voters of color who would be unable to vote for their senators of choice in 2012 elections and could be further deferred under an as-yet determined set of maps." Given all this, the Commission comments, it is "not surprising that the Commission considered and declined to draw completely nested Senate and Assembly districts, in favor of compliance with Article XXI, section 2's higher-order criteria."

We conclude that, insofar as petitioner's nesting map is concerned, she has provided us with no basis upon which we can determine that it respects federal and state law at least as much as any other of the proposed interim maps, including the Commission's certified state Senate map.

---

[50] By contrast, the Commission asserts, under the Commission's certified maps, state Senate District No. 33 — "a . . . Section 2 district [under the Voting Rights Act] — will elect State senators in 2012."

67

3. *Petitioner's proposed "model plan"*

As noted earlier, petitioner alternatively proposes that we adopt a wholly new "model plan" — a map based on a proposal submitted by petitioner's redistricting consultant, Dr. T. Anthony Quinn.

The petition does not undertake to describe the model plan, except to say that it would require the court to "redraw some but not all of the Senate Districts" and hence unlike the prior two proposals discussed above, it "would require relatively more time" to put into place. A November 22, 2011, declaration by Dr. Quinn, filed with the petition on December 2, provides some elaboration: The model plan is the same one submitted by petitioner in her September petition, *Vandermost v. Bowen* (Sept. 16, 2011, S196493), challenging the legality of the Commission's certified state Senate map. In that earlier petition, the model plan was presented and offered as a starting point for use by special masters whom petitioner asked us to appoint in order to recommend to this court a state Senate map to replace the Commission's certified Senate map. As noted, we denied the prior writ petition on October 26, 2011. Dr. Quinn's November 22 declaration states: "Should the court appoint an expert or a Special Master to draft an interim Senate map, I am prepared to present this map to the expert or master, and to provide all the necessary computer files for the map."

At this late stage in the schedule of election preparations, there simply does not exist sufficient time to adequately consider such an undefined new map. We concluded in October 2011 that there was no reason to appoint special masters or to further consider petitioner's proposed model plan, and, because it would be essentially impossible to consider and implement any such map now, that conclusion is all the more apt today.

4. *Interim proposal suggested by the Secretary of State and the Commission: Use of the Commission's certified state Senate map*

The Secretary of State and the Commission each urge us to hold that even if the Commission's certified Senate map eventually is stayed by the qualification of the

68

proposed referendum, the Commission's map should be employed for the 2012 elections because it is preferable to any of the alternative maps in a number of respects. As explained, for a number of reasons we conclude that the Commission-certified state Senate map is the best of the alternative maps that have been proposed for use in the 2012 elections in the event the proposed referendum qualifies for the ballot.

As an initial matter, as noted *ante*, we reject the suggestion in petitioner's brief that should the Commission-certified state Senate map be stayed by qualification of the proposed referendum, it would be impermissible for us to consider use of the Commission's state Senate map as an interim map for the 2012 elections. The majority opinion in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, repeatedly observed that, as decisions of the United States Supreme Court teach, a court in our situation has broad authority to consider "*any practical alternative . . . , including reapportionment plans which are not yet in effect and which are scheduled to be submitted to the electorate.*" (*Id.*, at p. 658, italics added; see also *id.*, at p. 659 ["a court, in the exercise of its equitable powers, may not only consider but also adopt reapportionment plans which are not yet final within the framework of a state constitution. This is precisely the action affirmed by the Supreme Court in *Reynolds v. Sims, supra,* 377 U.S. 533."]; *id.* at p. 660 ["Given the breadth of a court's equitable powers in reapportionment cases under federal law, it is clear that this court may give consideration to the Legislature's 1981 reapportionment plans, even though those plans are not yet in effect and are now scheduled to be submitted to a popular vote."].) Contrary to petitioner's suggestion, there is no indication in the text of Proposition 11 or Proposition 20, or the ballot materials relating to those measures, that either measure was intended to, or did, "vitiate" *Assembly v. Deukmejian* in this or any regard. Although we recognize, and take into account, that if the proposed referendum qualifies for the ballot this would indicate the Commission-certified state Senate district map has engendered a significant degree of opposition as reflected by the number of individuals who signed the referendum petition, we must at

the same time recognize the reality that the public has not had a comparable opportunity to scrutinize or express its opinion with regard to the merits of any of the alternative plans proposed by petitioner.

Second, as the Secretary of State and the Commission point out, unlike any of the other proposed maps, the Commission's state Senate district map has survived petitioner's prior legal challenge in this court. As mentioned earlier, petitioner's 126-page petition, *Vandermost v. Bowen* (Sept. 11, 2011, S196493), presented myriad federal and state statutory and constitutional challenges to the Commission's certified state Senate map. (See *ante*, fn. 7.) On October 26, 2011, after thorough consideration of all the issues raised by petitioner, we determined that the petition lacked merit and denied the requested writ. (See *In re Rose* (2000) 22 Cal.4th 430, 445 ["When the sole means of review is a petition in this court . . . our denial of the petition — with or without opinion — reflects a judicial determination on the merits."].) We are aware of no basis upon which to reasonably question the legality of the Commission's certified state Senate map. This clearly distinguishes the Commission-certified map from each of the alternatives proposed by petitioner.

Third, and unlike the proffered alternatives, not only do the Commission-certified Senate districts appear to comply with all of the constitutionally mandated criteria set forth in California Constitution, article XXI, the Commission-certified Senate districts also are a product of what generally appears to have been an open, transparent and nonpartisan redistricting process as called for by the current provisions of article XXI. We believe these features may properly be viewed as an element favoring use of the Commission-certified map.

On the other hand, we emphasize that our decision does not mean that we invariably will conclude that the Commission's certified map or maps always should be used on an interim basis in circumstances similar to the setting we address today. In some instances, for example, the Commission may draft and consider a number of

70

differently configured district maps and, after public comment, may make a controversial judgment with regard to which map to adopt and certify. If the controversy engenders a referendum that qualifies for the ballot, the court may have before it an alternative map drafted by a nonpartisan entity through an open process and that has been subject to review and comment by the public, hence satisfying most of the procedural safeguards embodied in California Constitution, article XXI.

There also are conceivable circumstances in which the "old" map or maps might be selected as an interim measure over the Commission's certified map or maps. As discussed in the briefs, because the state has undergone less population growth in the last decade compared with the 1970s, the extent of noncompliance of existing districts with federal equal protection principles is less than it was in the case of the districts considered in 1982 in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638. It is possible that in the future, old districts will remain substantially compliant with federal equal protection principles after a decade.

For other reasons, there may be less cause in the future to avoid selecting old maps as interim remedies. Although as noted earlier, the Legislature, in crafting its 2001 maps, was not guided by the criteria set forth in article XXI, section 2, subdivisions (d) to (f), and the resulting 2001 maps have been widely viewed as having been designed to protect incumbent legislators (see *ante*, at pp. 60-61), this will not be true of subsequent maps. All future maps, whether certified by the Commission (Cal. Const., art. XXI, § 2, subd. (g)) or adopted by this court with the assistance of special masters (*id*., §§ 2, subd. (j), 3, subd. (b)(3)), will be guided by the ranked constitutional criteria and article XXI's prohibition on designing districts to protect incumbent legislators.

Moreover, in some instances, due to the procedural posture of the case, the court may find it proper to avoid use of the Commission's certified map or maps on an interim basis. If, for example, we are faced with a request for interim relief in light of a pending referendum challenge *at the same time that* we concurrently are considering a legal challenge to the Commission's maps for failure to properly follow the prescribed constitutional

71

procedures or criteria (see Cal. Const., art. XXI, § 3(b)), we may conclude that the Commission's maps are not a sound basis for interim relief.

Although a variety of circumstances, singly or in combination, could lead this court to conclude in a future case that a Commission-certified map should not be used as an interim map pending a referendum challenging that map, no such circumstance is present in this case.

## V. *Conclusion and disposition*

For the reasons set out above, we conclude that this court is authorized to entertain this writ petition at this time and to determine which state Senate districts should be used for the 2012 primary and general elections in the event the proposed referendum qualifies for placement on the ballot and stays the operative effect of the Commission-certified state Senate district map. We decline petitioner's request to issue a peremptory writ of mandate commanding the Secretary of State to refrain from taking any action implementing the Commission's certified state Senate map. Instead we order that, if the proposed referendum qualifies for the ballot, the Secretary of State and local election officials are to use the state Senate map certified by the Commission as interim boundaries for the 2012 primary and general elections. The Commission's certified state Senate map is the alternative most consistent with the constitutional scheme and criteria embodied in the federal and state Constitutions.

The relief sought by petitioner is denied. If the proposed referendum qualifies for the ballot, the Secretary of State and local election officials are directed to use the state Senate map certified by the Commission for the June 5, 2012, Primary Election and the November 6, 2012, General Election. Each party shall bear its own costs in this proceeding. Our judgment is final forthwith.

                                                    CANTIL-SAKAUYE, C. J.


WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

## CONCURRING OPINION BY LIU, J.

More than a half century ago, Justice Felix Frankfurter observed that "[t]he one stark fact that emerges from a study of the history of [legislative] apportionment is its embroilment in politics, in the sense of party contests and party interests." (*Colegrove v. Green* (1946) 328 U.S. 549, 554 (plur. opn. of Frankfurter, J.).) Faced with entreaties by litigants seeking judicial intervention in the redistricting process, Justice Frankfurter famously warned that "[c]ourts ought not to enter this political thicket." (*Id.* at p. 556.) Although the law has not adopted the uncompromising version of this principle urged by Justice Frankfurter (see, e.g., *Reynolds v. Sims* (1964) 377 U.S. 533; *Baker v. Carr* (1962) 369 U.S. 186), his admonition continues to resonate each decade when courts are asked to decide what are fundamentally *political* disputes. Judicial restraint is especially important in the context of legislative redistricting because, as the high court recently observed, "experience has shown the difficulty of defining neutral legal principles in this area." (*Perry v. Perez* (2012) 565 U.S. __ [2012 WL 162610, 2012 U.S. Lexis 908].)

In this case, I agree with the court's bottom line: the Senate district map certified by the Citizens Redistricting Commission (Commission) is the interim map that should be used in the event that petitioner's referendum qualifies for the ballot. As the court explains (maj. opn., *ante*, at pp. 43-72), we need not exclude the Commission map from consideration as a possible interim map, and the Commission map is superior to the proposed alternatives when evaluated against applicable federal and state redistricting criteria. I write separately, however, because I believe the court's discussion of our

1

authority to decide cases such as this leaves too much to "prudence" (maj. opn., *ante*, at pp. 24, 32, 33, 35, 36) and places insufficient emphasis on language in the California Constitution that channels and checks our discretion.

Today's opinion concludes that "under California Constitution, article VI, section 10, this court is authorized to issue an order to show cause and decide which districts should be used in the event a proposed referendum directed at a Commission-certified redistricting map qualifies for the ballot, even in the absence of a showing that the proposed referendum is likely to qualify for the ballot." (Maj. opn., *ante*, at p. 41.) The court will find a mandate action ripe for decision "when we conclude that, in light of the relative probability that the proposed referendum will qualify for the ballot and the time limitations and potential detrimental consequences of refusing to consider a mandate petition at that point in time, it is prudent to issue an order to show cause and decide which districts should be used in the upcoming elections in the event the proposed referendum does qualify for placement on the ballot." (*Id.* at p. 32.)

I believe these statements, by maximizing our discretion, will have the unintended consequence of inviting future litigants to bring their grievances with the redistricting process to this court. Of course, the court will exercise prudence in addressing those litigants' claims. However, as this court's own experience shows, redistricting controversies are fraught with political peril. Where one judge sees prudence, another may see partisanship. I respectfully disagree with the court's unduly broad assertion of authority because it underestimates the risks of political entanglement that are inherent to redistricting disputes and because the all-things-considered discretion it contemplates gives insufficient weight to language in our Constitution that can help the court avoid such entanglement.

## I.

As an initial matter, I agree with the court that we have jurisdiction under California Constitution, article VI, section 10 to entertain a petition for writ of mandate

2

and to issue an order to show cause in this matter. Our jurisdiction, in the fundamental sense of lawful authority to hear the case, is not in question.

The question we face is under what circumstances this court should decide the merits of a petition seeking relief in the form of an interim map to be used in the event that a referendum challenging a Commission map qualifies for the ballot. Uncertainty as to whether a proposed referendum will qualify for the ballot presents a timing problem with two competing dimensions. On one hand, the court risks acting too late if it waits for the signature verification process to indicate whether the referendum will qualify. "[I]f this court were to conclude that other districts should be used in the event the referendum qualifies, it may be too late at that time to apply the court's decision to implement those other districts." (Maj. opn., *ante*, at p. 31.) On the other hand, the court risks acting too early if it decides the merits of the petition and selects an interim map before knowing whether the referendum will qualify. "[T]he issuance of a court decision favoring an alternative map over the Commission-certified map might — in the event the referendum does not qualify — unnecessarily cast a cloud over the legitimacy of that Commission-certified map for the ensuing decade . . . ." (*Id.* at p. 36.)

The risk of acting too early is not present where, as here, the court concludes that the Commission map should be the interim map if petitioner's referendum qualifies for the ballot. "Even if, after the court issues its opinion, the referendum ultimately does not qualify for the ballot and the Commission-certified map is not stayed, issuance of the court's decision — approving the Commission's map — could have no adverse effect upon the Commission-certified map." (Maj. opn., *ante*, at p. 35.) Under such circumstances, there is no need to assess the referendum's likelihood of qualification, and the court "should issue its decision as early as possible so as to eliminate the uncertainty that inevitably arises from the ongoing signature verification process and the pendency of the writ proceeding in this court." (*Ibid.*)

3

Today's decision could have resolved the timing issue on that basis and left matters there. However, in an effort "to provide guidance on this procedural point for the future" (maj. opn., *ante*, at p. 20), the court goes further to broadly hold that we have discretion and maximum flexibility to determine whether and when we may decide which map should be used upon qualification of a referendum, even where the interim map we choose is *not* the Commission map. (See *id.* at pp. 31-32, 35-36.) In that scenario, where the court concludes that an alternative map is superior to the Commission map, the problematic consequences of acting too early or too late come to the fore. This case does not present that scenario, but it is clear that the court's broad holding applies to that scenario and is expressly intended to address it. (See *id.* at p. 31.) Accordingly, the discussion from here forward addresses the court's understanding of our authority in circumstances where we find or contemplate finding that an alternative to the Commission map should be the interim map.

In my view, the court's articulation of its authority raises two concerns. First, the court refers to the harm from acting too early as a "possibility" that "might" come to pass. (Maj. opn., *ante*, at p. 36.) I see no reason for such tentative acknowledgment of the substantial harm at issue. If the court issues a decision favoring an alternative to the Commission map but the referendum does not end up qualifying, the court's decision would have needlessly burdened election officials with using a dual-track planning process until completion of the signature verification process. More importantly, serious concerns about the fairness and legitimacy of the electoral process would arise throughout the next decade if a Commission map were to go into effect in the shadow of an opinion by this court favoring another map even if only on an interim basis. These problems are hardly speculative. The consequences of acting too early are at least as serious and foreseeable as the consequences of acting too late, yet the court's opinion seems far less concerned with the former than with the latter. (See *id.* at pp. 30-33.)

4

This imbalance contributes to the second concern, and that is the expansive discretion the court claims for itself to decide whether and when to act on a mandate petition in cases where it finds that an alternative map is superior to the Commission's. The court says it may act "when we conclude that, in light of the relative probability that the proposed referendum will qualify for the ballot and the time limitations and potential detrimental consequences of refusing to consider a mandate petition at that point in time, it is prudent" to act. (Maj. opn., *ante*, at p. 32.) Elsewhere the court says it "may properly grant relief . . . when the court is of the view that there is a sufficient chance that the proposed referendum will qualify to make it prudent for the court" to do so. (*Id.* at p. 33.) And "[i]n determining whether it is prudent to issue its decision *in advance* of the proposed referendum's qualification notwithstanding [the] potential adverse consequence [of acting too early] (and if so, how far in advance), this court would undoubtedly take into account the particular reasons underlying its analysis and determination that an alternative map is more consistent with the constitutionally based criteria than the Commission-certified map, and then decide if and when to issue its opinion based in part on such considerations." (*Id.* at p. 36.)

These verbal formulations all boil down to the same thing: the court will act when the court feels it is prudent to do so. (See maj. opn., *ante*, at p. 36 ["[T]his court properly retains broad discretion to take into account all such considerations as well as any other relevant factor in deciding what relief is appropriate in such a proceeding and when it should be ordered."].) It casts no doubt on the court's collective wisdom to worry that such open-ended discretion offers little in the way of an objective standard for determining — in the face of uncertainty and the serious risks it entails — whether and when to issue a decision as important as declaring that a map other than the Commission's should be used as an interim map. In effect, the court's opinion invites future litigants to make their best case for or against judicial intervention without supplying a determinate legal principle that can help keep our decisionmaking, in

5

appearance and reality, above the political fray.  We need not place such a heavy burden on the dictates of our own prudence, for the text of our Constitution provides a better approach.

II.

The voters of California fundamentally reformed the redistricting process when they passed Proposition 11 in 2008 and Proposition 20 in 2010.  Those initiatives created the Commission, defined its membership, procedures, and responsibilities, established a prioritized list of redistricting criteria, and provided that Commission-certified maps may be challenged by referendum.  In addition, the recent reform contemplates this court's intervention in the redistricting process in four circumstances.  First, a registered voter may challenge the lawfulness of a Commission map within 45 days after it is certified.  (Cal. Const., art. XXI, § 3, subd. (b)(2), (3).)  Second, when the Commission does not approve a final map by the requisite votes, it is this court's duty to supply a map with the aid of a special master.  (*Id.*, § 2, subd. (j).)  Third, when voters disapprove a Commission map in a referendum, the court also must supply a map with the aid of a special master.  (*Ibid.*)

The fourth circumstance is the one relevant here:  "Any registered voter in this state may also file a petition for a writ of mandate or writ of prohibition to seek relief where a certified final map is subject to a referendum measure that is likely to qualify and stay the timely implementation of the map."  (Cal. Const., art. XXI, § 3, subd. (b)(2) (hereafter section 3(b)(2)).)  This sentence of section 3(b)(2) addresses situations where a referendum challenging a Commission map has not yet qualified for the ballot, and it provides guidance on the timing problem we face.

Section 3(b)(2) was enacted as part of Proposition 20 along with another provision that moved up the date by which the Commission must release its final maps from September 15 to August 15.  (Cal. Const., art. XXI, § 2, subd. (g).)  The evident purpose of these provisions was to give this court flexibility to act in situations where a

6

referendum is likely to qualify but where the signature verification and official qualification process has not reached completion.  Further, article XXI, section 3, subdivision (b)(3) of the California Constitution (hereafter section 3(b)(3)) says:  "The California Supreme Court shall give priority to ruling on a petition for a writ of mandate or a writ of prohibition filed pursuant to [section 3(b)(2)]."

At a minimum, section 3(b)(2) means that a petition for relief in the form of an interim map is properly before the court and ripe for adjudication on the merits where the petitioner has shown that a referendum challenging a Commission map is likely to qualify.  Section 3(b)(3) makes clear that the court must act expeditiously to decide the merits of such a petition.  The import of these constitutional provisions is that when a petitioner has shown that a referendum is likely to qualify, the probability of qualification is sufficiently high that this court must promptly provide guidance to election officials on the interim map that will be used in the event that the referendum ultimately does qualify.  Although a referendum deemed likely to qualify may still end up not qualifying, sections 3(b)(2) and 3(b)(3) imply that the risk is sufficiently low that the court should decide the merits of the petition.

While acknowledging that a petition is "sufficiently ripe . . . to be entertained" when a referendum is likely to qualify (maj. opn., *ante*, at p. 39), today's opinion stops short of saying that the court should promptly decide the merits of such a petition.  Instead, the court says that "the 'likely to qualify' language of article XXI, section 3(b)(2) is not directed to the time when the court *may or should decide the merits* of the mandate petition, but rather to the time when a registered voter *may file* such a petition in this court."  (*Id.* at p. 40, fn. 25.)  Even if this reading of section 3(b)(2) were correct (and I am doubtful that it is (see *post*, at pp. 8-11)), section 3(b)(3) leaves no ambiguity as to what this court is supposed to do.  Where a petitioner has shown that a referendum is likely to qualify, the "ruling" contemplated by section 3(b)(3)'s mandate that this court

7

"shall give priority to ruling on a petition . . . filed pursuant to [section 3(b)(2)]" can only be understood as a ruling on the merits.

Sections 3(b)(2) and 3(b)(3) thus answer part of the timing question we face: when a referendum is likely to qualify, the court must act. But what should the court do when available information does not support a finding that a referendum is likely to qualify? If a petitioner cannot show that a referendum is likely to qualify, what significance does that circumstance have for whether and when the court should act? I agree with today's opinion that because section 3(b)(2) "does not purport to limit this court's jurisdiction" (maj. opn., *ante*, at p. 38), a petitioner's inability to show that a referendum is likely to qualify does not deprive the court of its prerogative to decide whether and when to act. But I do not agree that failure to show that a referendum is likely to qualify has no particular significance to the exercise of our authority, beyond being a factor that it may be "prudent" to consider. (*Id.* at p. 36.)

Once again, section 3(b)(2) says: "Any registered voter in this state may also file a petition for a writ of mandate or writ of prohibition to seek relief where a certified final map is subject to a referendum measure that is likely to qualify and stay the timely implementation of the map." Textually, the phrase "where a certified final map is subject to a referendum measure that is likely to qualify" is sensibly read as a condition precedent to the availability of "relief" under section 3(b)(2). Just as the "likely to qualify" standard serves to mitigate the risk of acting too late, it also serves to mitigate the risk of acting too early. Where the probability of qualification is sufficiently low that a referendum cannot be deemed likely to qualify, the court generally should stay its hand because of the sufficiently high risk that issuing a decision on the merits will prove unnecessary and injurious to the electoral process. Section 3(b)(2) addresses the uncertainty where a referendum has not yet qualified by balancing the public interest in giving the referendum's supporters a timely opportunity to seek relief in the event that the referendum does qualify against the public interest in having a Commission-certified map

8

implemented without disruption in the event that the referendum does not qualify. In other words, the "likely to qualify" standard strikes the very balance that the court would relegate to its sense of prudence. Because section 3(b)(2) does not limit this court's jurisdiction over original writ proceedings, it is always possible that exceptional circumstances may compel the court to act even where a petitioner has not shown that a referendum is likely to qualify. However, I would adopt as a general rule — indeed, a presumption — that where a petitioner has not shown that a referendum is likely to qualify, the court should not decide the merits of the mandate petition.

The court contends that the "likely to qualify" language in section 3(b)(2) has no bearing on when judicial action is warranted and, as a textual matter, speaks "to the time when a registered voter *may file*" a petition for writ of mandate or writ of prohibition. (Maj. opn., *ante*, at p. 40, fn. 25.) But it makes little sense to read section 3(b)(2) as a timing provision that pertains to *filing* in light of the court's conclusion that under article VI, section 10 of the California Constitution, a petition for writ of mandate or prohibition may be filed whether or not the petitioner can show that a referendum is likely to qualify. (See *id.* at pp. 23-24 & fn. 18, 38.) Instead of indicating when a registered voter may file a petition, the "likely to qualify" language in section 3(b)(2) is better read as specifying when relief is available and may be granted by this court before a referendum has qualified for the ballot.

More fundamentally, the court objects to this reading of section 3(b)(2) on the ground that it would limit our authority to entertain a mandate petition, even just to issue an order to show cause, unless a petitioner has shown that a referendum is likely to qualify. (Maj. opn., *ante*, at p. 40, fn. 25.) But my interpretation would not have "this type of limiting effect on this court's authority." (*Ibid.*) Where, as here, an original writ petition is properly filed pursuant to article VI, section 10 of the California Constitution, the court has jurisdiction and may issue an order to show cause, entertain briefing and oral argument, and deliberate. If the court concludes that the Commission map should be

9

the interim map, it may and should say so as early as possible.[1] Otherwise, the court generally should not decide the merits of the petition or grant relief before it finds that the referendum is likely to qualify. The inability to make that finding at the moment the petition is filed does not mean we must dismiss the petition. The court may retain jurisdiction and await further information on the referendum's likelihood of qualification. If additional information shows that the referendum is likely to qualify, the court will be poised to act expeditiously.[2]

---

[1] Doing so without determining whether the referendum is likely to qualify does not "depart[] . . . from the language of article XXI, section 3(b)(2)" (maj. opn., *ante*, at p. 41, fn. 25) because in cases such as this, where we deny a petitioner's request to order interim use of a non-Commission map, we are not granting any "relief" sought by the petitioner under section 3(b)(2). In light of section 3(b)(2)'s text ("Any registered voter in this state may . . . file a petition . . . to seek relief"), the illogic of the court's assertion that we are granting "relief" within the meaning of section 3(b)(2) "whether or not the particular outcome ordered by the court is the relief petitioner is seeking" (maj. opn., *ante*, at p. 41, fn. 25) speaks for itself.

[2] The practice of retaining jurisdiction in a mandate proceeding and postponing action in light of possible developments is not unfamiliar to this court. (See *Legislature v. Reinecke* (1973) 10 Cal.3d 396, 400.) As a result of litigation after the 1970 census and reapportionment, we adopted temporary maps for the 1972 elections and retained jurisdiction to draw new maps for subsequent elections if the Legislature failed to enact valid maps during the 1972 regular session. (*Ibid.* [citing *Legislature v. Reinicke* (1972) 6 Cal.3d 595, 603-604].) Subsequently, "at the request of the Senate of the State of California, we postponed the time for further court action" in order to allow the Legislature an opportunity to act in special session. (*Ibid.* [citing *Legislature v. Reinicke* (1972) 7 Cal.3d 92, 93].) When the Legislature failed to enact valid maps in 1972, we appointed three special masters to propose new maps, even as we made clear that " 'If at any time during the proceedings contemplated by this order valid congressional and legislative reapportionment measures are enacted the court will entertain an application to dismiss these proceedings.' (*Legislature v. Reinicke* (1973) 9 Cal.3d 166, 168.)" (*Ibid.*) Although *Legislature v. Reinicke* did not present the same issues we face here, the case illustrates the flexibility the court possesses to retain jurisdiction and defer decision where the exercise of our authority depends on developments occurring after we initially assume jurisdiction.

In essence, the court's objection to my interpretation of section 3(b)(2) confuses the issue of *whether the court has authority to entertain a mandate petition* with the separate and distinct issue of *how that authority should be exercised*. The first issue is settled by article VI, section 10 of the California Constitution. (See *ante*, at pp. 2-3.) Section 3(b)(2) speaks only to the second issue. In exercising its proper authority to entertain a mandate petition seeking relief in the form of an interim map, under what circumstances may the court grant relief before a referendum has qualified for the ballot? Section 3(b)(2) answers that question by stating a condition precedent to the availability of relief — namely, a showing that the referendum is likely to qualify.

The advantage of this approach is precisely what the court sees as its disadvantage: it limits our discretion. By using the phrase "likely to qualify," section 3(b)(2) provides an objective and determinate standard for balancing the competing risks of acting too early versus acting too late. In ordinary usage, the word "likely" is commonly understood to mean "more likely than not." (See, e.g., Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 721 [defining "likely" to mean "having a high probability of occurring or being true"]; Webster's International Dict. (3d ed. 2002) p. 1310 [defining "likely" to mean "having a better chance of existing or occurring than not"]; Garner, A Dict. of Modern Legal Usage (2d ed. 1995) p. 530 ["*likely* has different shades of meaning" but "[m]ost often it indicates a degree of probability greater than five on a scale of one to ten"]; Black's Law Dict. (6th ed. 1990) p. 925 [defining "likely" to mean "probable and having better chance of existing or occurring than not"].) Although the court in *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 916-917 said that the meaning of "likely" may depend on context, *Ghilotti* interpreted the phrase " 'likely to engage in acts of sexual violence' " as part of an intricate statutory scheme enacted by the Legislature to provide for civil commitment of inmates previously convicted of a sexually violent offense. (See *id.* at pp. 915-929.) The particularized meaning of words in complex, legislatively enacted statutes has little bearing on the interpretation of words

11

in an initiative, which we construe according to their ordinary meanings as understood by "the average voter." (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 902.)

To be sure, the "likely to qualify" standard does not fully immunize the court from the risks of acting too early or too late. A referendum shown to be likely to qualify may end up not qualifying, and a referendum not shown to be likely to qualify may end up qualifying. But the risk of error in one direction or the other is present in any approach to the timing problem. That is the nature of uncertainty. Rather than address the uncertainty through the prudential exercise of discretion, I would make use of the objective constitutional standard that already balances the competing risks.

As a practical matter, the "likely to qualify" standard does not impose a heavy burden on the petitioner or on this court. In most cases, determining whether a referendum is "likely to qualify" will be a simple matter. The random sampling that takes place when a referendum has gathered a sufficient number of signatures will usually resolve the issue in a timely fashion. As the court explains: "Under the governing statutory provisions, if the random sampling projected a number of total valid signatures that was less than 95 percent of the required number of valid signatures, the petition would fail without any further count. If the projection of valid signatures was 110 percent or more of the required number, the petition would qualify without any further count. If the projection of valid signatures was between 95 and 110 percent, the Secretary of State would notify counties that a full count of all submitted signatures would be required to verify the number of valid signatures that had been submitted. (Elec. Code, §§ 9030, subds. (f) & (g), 9031, subd. (a).)" (Maj. opn., *ante*, at pp. 28-29.)

According to documentation attached to petitioner's declaration, of the 48 initiatives and referenda submitted to the Secretary of State between 2005 and 2010, 44 of them were projected to receive more than 110 percent of the needed signatures. Those measures qualified for the ballot without any need to count all the signatures submitted. In such cases, even before the referendum is officially certified by the Secretary of State, this court can

12

conclude that the referendum is likely to qualify. The random count in this case was completed by January 10, and it is likely that such counts will be completed around the same time in the future. That date is well before "the end of January 2012," which is the latest time by which the Secretary of State and county election officials need to be informed of this court's decision in order "to implement any changes in the state Senate districts in the event the proposed referendum qualifies and automatically stays the Commission-certified state Senate redistricting map." (Maj. opn., *ante*, at p. 30.)

If random sampling yields a projection between 95 percent and 110 percent of the signatures needed and a full count is required, this court will still be able to determine whether a referendum is likely to qualify in most cases. In supplemental briefing, the Secretary of State claimed that "to use the completed sampling process to determine at what point a petition becomes likely to qualify . . . is beyond the capacity of the process" and that "the sampling technique is not designed to give reliable results at a greater level of precision" than determining "whether the number of valid signatures on petitions is within a broad range, 95 [percent] to 110 [percent]." But the Secretary of State also acknowledged in the same briefing that the experience of the four initiatives within the last five years that required a full count in order to qualify for the ballot "suggests that the sampling process is reasonably accurate within a margin of about 1.5%."[3] Although the Secretary of State said

---

[3] The Secretary of State's supplemental briefing identified four initiatives in the past five years that went to a full count. Measure No. 1226, a 2009 initiative concerning community colleges, had a random sample validity rate of 71.38 percent and a full count validity rate of 71.08 percent. Measure No. 1271, a 2009 initiative concerning a children's hospital bond, had a random sample validity rate of 69.30 percent and a full count rate of 70.84 percent. Measure No. 1311, a 2011 term limits measure, had a random sample validity rate of 75.58 percent and a full count rate of 74.36 percent. Finally, a 2011 attempt by the Americans Elect political party to qualify for the ballot through a signature drive had a random sample validity rate of 69.81 percent and a full count rate of 68.08 percent.

she was "reluctant to draw firm conclusions from a sample that consists of only four examples," the examples do offer some indication, however limited, that the random sampling process can predict the full count within a fairly small margin of error.

Contrary to the Secretary of State's suggestion, the Legislature's determination that random sampling must yield a projection of at least 110 percent of the signatures needed before a referendum will be deemed *qualified* does not preclude a petitioner from citing a projection less than 110 percent as evidence that a referendum is *likely to qualify*. Indeed, because a referendum actually *qualifies* with a projection equal to or greater than 110 percent, logic dictates that a lesser projection may support a finding that a referendum is merely *likely to qualify*. For example, where random sampling yields a projection of 105 percent of the total signatures needed, the referendum does not qualify on that basis and must go to a full count. But the projection would still be credible evidence, given the past relationship between random counts and full counts, that the referendum is likely to qualify.

The task of timely determining whether a referendum is likely to qualify is more difficult when random sampling yields a projection that is very close to the minimum number of signatures required. Petitioner asserts that whenever random sampling projects 100 percent or more of the needed signatures, the referendum should be deemed likely to qualify. But petitioner offers no analysis or expert declarations in support of this claim. At oral argument, petitioner asserted that more refined analysis of whether a referendum is likely to qualify is within the competence of various experts and experienced consultants. Although we need not apply the "likely to qualify" standard in this case because of our ultimate disposition (see *ante*, at pp. 3-4), future litigants would be well-advised to bring expert analysis to bear where the issue is a close call. Statistical certainty is not required in order to render a legal judgment applying the "likely to qualify" standard (presumably, a petitioner need only show that a referendum is "likely to qualify" by a preponderance of the evidence), but the court would benefit from expert interpretation of available information.

14

Finally, it is worth noting that, although my view of section 3(b)(2)'s significance for the timing of judicial intervention differs from the court's, nothing I have said is technically inconsistent with the court's broad holding that the issue of timing should be resolved according to the dictates of prudence. My sense of prudence, which subsumes my reading of the law, impels me to assign particular significance to whether a referendum is likely to qualify in deciding whether and when we should act on the merits of a mandate petition. But whether the prudence of my colleagues would lead each of them to the same conclusion or to different conclusions in a case where the issue really matters is an open question. And that, in a sense, illustrates the problem with the court's approach.

III.

Because our disposition in this case is unanimous, the concerns I have expressed may seem speculative. But the court typically speaks on redistricting only once a decade, and today's opinion deliberately paints with a broad brush. It is of course anyone's guess what the future will bring. But history provides a cautionary tale.

Thirty years ago, this court had a very different experience with a redistricting controversy. After the 1980 census, the Democratic-controlled Legislature enacted and the Governor, also a Democrat, signed in September 1981 three reapportionment statutes revising the boundaries of the state's congressional, Senate, and Assembly districts. The Republican Party initiated a referendum against each of these reapportionment statutes. By December 15, 1981, these referenda had qualified for the June 1982 ballot. Various members of the Assembly, Senate, and United States House of Representatives filed mandate proceedings claiming that defects in the referendum petitions rendered the petitions invalid. They also claimed that even if the referenda did qualify for the ballot, they should not stay implementation of the new legislative maps for the June 1982 election.

15

In *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, this court rejected the challenges to the validity of these referenda and affirmed that the referenda stayed the reapportionment statutes, as they would any other statute.  (*Id.* at pp. 656-657.)  The court then considered the appropriate remedy.  The referenda proponents argued that the court should order use of the old maps in the interim, as the court had done in *Legislature v. Reinecke* (1972) 6 Cal.3d 595, a case in which the new legislative maps had been vetoed by the Governor and never became law.  By a four-to-three majority, the court in *Assembly v. Deukmejian* declined to order use of the old maps, instead concluding that the new maps should be used in the interim primarily because they were drawn to comply with the one-person, one-vote requirement of the Fourteenth Amendment's equal protection clause.  (*Assembly v. Deukmejian*, *supra*, 30 Cal.3d at pp. 665-668.)

The court's holding in favor of the new maps prompted three separate dissenting opinions.  Justice Richardson, in an opinion joined by Justice Mosk and Justice Kaus, explained that it was improper to use new maps that had been stayed by qualification of the referenda and that using the old maps until the referenda were voted on would not violate the equal protection clause.  (*Assembly v. Deukmejian*, *supra*, 30 Cal.3d at pp. 680-685 (conc. & dis. opn. of Richardson, J.).)  According to Justice Richardson, "the majority completely disregards [the] stay [of the new maps] and imposes upon the people of California a state legislative reapportionment plan which has been stopped dead in its tracks by operation of law and which is heavily veiled in a cloud of political uncertainty.  The majority's adoption of this plan prejudges the result and its action can only be perceived as an official alignment of the court with one side in a partisan dispute as to which we should remain scrupulously neutral."  (*Id.* at p. 680.)

In a separate opinion, Justice Mosk wrote that "a bare majority of this court have become entangled in the 'political thicket' by ignoring their obligation of neutrality on a partisan issue, a neutrality that can be observed only by maintenance of the status quo in legislative districting until the people speak at the forthcoming election."  (*Assembly v.*

*Deukmejian*, *supra*, 30 Cal.3d at p. 693 (conc. & dis. opn. of Mosk, J.).) And Justice Kaus wrote separately to say that "the course chosen by the majority involves greater judicial intrusion into the legislative process laid out by the California Constitution." (*Id.* at p. 694 (conc. & dis. opn. of Kaus, J.).)

I express no view on which side was correct in *Assembly v. Deukmejian*. But I am confident that each of the four justices who voted in favor of the new maps, as well as each of the three justices who voted in favor of the old maps, cast his or her vote on the basis of a well-informed assessment of the lawful and prudent course. (Compare *Assembly v. Deukmejian*, *supra*, 30 Cal.3d at pp. 675-676 [use of new maps would be the least disruptive remedy] with *id.* at p. 692 (conc. & dis. opn. of Richardson, J.) [use of old maps would be least disruptive].) Even so, the court ultimately fractured in a series of strongly worded opinions laced with charges of partisanship.

*Assembly v. Deukmejian* did not present the timing issue we face here. But the case confirms that "[l]ogic, as well as experience, tells us . . . that there can be no total sanctuaries in the political thicket." (Dixon, *The Court, The People, and "One Man, One Vote," in Reapportionment in the 1970s* (Polsby edit. 1971) p. 32.) Today the court unanimously agrees that the Commission map is superior to the proposed alternatives. In a future case, the court may be divided with regard to which map should serve as an interim map and, closely related, whether and when to issue a decision on that important issue. Those questions will inevitably play out against a backdrop of partisan interests. I hope the court is correct that prudence will be sufficient to guide us out of the thicket. But I believe the language of our Constitution already provides the guidance we need.


LIU, J.


17

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Vandermost v. Bowen

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S198387
**Date Filed:** January 27, 2012

_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Thomas W. Hiltachk, Colleen C. McAndrews, Paul T. Gough, Brian T. Hildreth and Ashlee N. Titus for Petitioner.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Peter A. Krause and George Waters, Deputy Attorneys General; and Lowell Finley for Respondent.

Morrison & Foerster, James J. Brosnahan, George C. Harris and Benjamin J. Fox for Intervener.

Remcho, Johansen & Purcell, Robin Johansen and Thomas A. Willis for Senator Darrell Steinberg as Amicus Curiae on behalf of Respondent and Intervener.

Kathay Feng for California Common Cause as Amicus Curiae on behalf of Intervener.

Nielson Merksamer Parrinello Gross & Leoni, Margueirte Mary Leoni and James R. Parrinello for Charles T. Munger, Jr., as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Charles H. Bell, Jr.
Bell, McAndrews & Hiltachk
455 Capitol Mall, Suite 600
Sacramento, CA  95814
(916) 442-7757

George Waters
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-8050

James J. Brosnahan
Morrison & Foerster
425 Market Street
San Francisco, CA  94105-2482
(415) 268-7000